Frances BENSON, Plaintiff,

v.

RMJ SECURITIES CORP., Eugene Cates, George Wunsch, Paul Ryan, Richard Jackson, Security Pacific Corporation and the Estate of John McSharry, Defendants.

No. 85 Civ. 2109 (RJW).

United States District Court, S.D. New York.

March 31, 1988.

Goldschmidt, Oshatz & Saft, New York City, Torre, Garman & Amdur, East Rutherford, N.J., for plaintiff; Edward Sussman, New York City, Harry L. Garman, East Rutherford, N.J., of counsel.

Simpson Thacher & Bartlett, New York City, for defendants RMJ Securities Corp., Eugene Cates, George Wunsch, Paul Ryan and Richard Jackson; Kenneth R. Logan, Joseph F. Tringali, Charles C. Graves II, of counsel.

Jones, Hirsch, Connors & Bull, New York City, for defendant Estate of John McSharry; John F. Cambria, of counsel.

ROBERT J. WARD, District Judge.

Frances Benson, a residuary beneficiary of the estate of John McSharry ("the Estate" or "the McSharry Estate"), brought this action claiming violations of the federal securities laws, with pendent state law claims, in the redemption from the McSharry Estate by RMJ Securities Corporation ("RMJ") of McSharry's stock holdings in RMJ. The parties have filed cross-motions for summary judgment. For the reasons that follow, the Court grants defendants'

motion in part and denies it in part. Plaintiff's motion is denied in its entirety.

## BACKGROUND

John McSharry founded RMJ in 1974 for the purpose of trading in government securities and obligations. RMJ was organized as a closed corporation, and its management was governed by a series of shareholders' agreements entered into by McSharry and his fellow shareholders. According to the first agreement, dated December 1985, McSharry, Paul Ryan, George Wunsch and Eugene Cates were senior partners with equal holdings in RMJ, and Richard Jackson was a junior partner.[1] A second agreement, entered into in April 1976, preserved the distribution of shares among the principals set forth in the original agreement. Exhibit B, annexed to Affidavit of Richard G. Jackson, filed October 14, 1986 ("Jackson Aff."). A third agreement, dated April 1977, doubled Jackson's stake in the company, while maintaining his inferior status as a junior shareholder.[2] This distribution was retained in the April 1977 agreement, which was the last agreement to be executed by the parties. A draft agreement, dated November 1979, was drawn up at the direction of the shareholders, but this draft was never executed. According to the terms of the November 1979 draft agreement, each of the five original shareholders, plus a sixth, Edward O'Connell, each held equal shares in RMJ. Exhibit E, annexed to Jackson Aff.

Each successive agreement provided that it could be amended only by a writing signed by all the parties. Since the November 1979 agreement was never signed, the terms of the April 1977 agreement governed the operations of RMJ at all times relevant to the instant action,[3] although the draft November 1979 agreement is probative as to the intent of the shareholders,

1. McSharry, Ryan, Wunsch and Cates each held stock representing 23.75% of the company. Jackson held 5% of the outstanding stock. Exhibit A, annexed to Affidavit of Richard G. Jackson, filed October 14, 1986 ("Jackson Aff.").

2. In the April 1977 agreement, Jackson's stake in RMJ was increased from 5% to 10% of the outstanding shares. Accordingly, the stake held

by each of the four senior shareholders was reduced to 22.5%. Exhibit C, annexed to Jackson Aff.

3. Where context permits, the April 1977 shareholders' agreement will be referred to simply as "the Agreement" or "the Shareholders' Agreement."

where that intent is relevant.[4]

The April 1977 Agreement provided that none of the shareholders would encumber or dispose of his stock in RMJ without the consent of the others.[5] The Agreement also provided for the redemption by RMJ of a shareholder's stock upon his death. The redemption at death was mandatory on both the shareholder and RMJ. The redemption price was set as the book value of the shares, plus the sum shown on an exhibit attached to the Agreement. This sum was intended to reflect the present value of RMJ's goodwill and was intended to be flexible. The Agreement set the Goodwill factor at $100,000 and provided that this Goodwill factor could be changed by a signed writing upon agreement of the shareholders.[6] The representatives of a deceased shareholder would also be entitled to any accumulated commission earnings credited to his account.[7]

The Agreement also provided that a shareholder would tender his shares to RMJ in the event he were to leave the employ of RMJ. The price of the buy-back upon termination was to be the same as that provided for in the event of death. If a shareholder tendered his shares to RMJ for redemption and if RMJ refused to redeem the shares, then the remaining shareholders were obligated to purchase the tendered shares upon the same terms and conditions that would be applicable to RMJ. In the event the remaining shareholders refused to purchase the shares, the selling shareholder could then force the dissolution of RMJ.[8]

4. Though it was not itself signed, the November 1979 agreement was subscribed to by Cates, Wunsch, Ryan and Jackson in two separate Employment Termination Agreements, dated March 5, 1981 and September 30, 1981, between Edward O'Connell and RMJ. These two documents made express reference to "the terms of the Shareholder's Agreement of RMJ dated April 15, 1977 as amended by an unsigned agreement dated November 1979." Exhibits G, H, annexed to Jackson Aff.

5. This provision remained unchanged in each of the successive shareholder agreements and in the November 1979 draft agreement. *Compare* Exhibits A–C, E, annexed to Jackson Aff.

6. Each of the successive agreements provided for the mandatory redemption at death. The earliest agreement, however, did not include any Goodwill factor. The redemption price according to the December 1975 agreement was simply the book value of the shares. The Goodwill factor was first included in the April 1976 agreement, where it was set at $50,000. The April 1977 agreement increased the Goodwill factor to $100,000, and the draft November 1979 agreement set the Goodwill factor at $150,000. *Compare* Exhibits A–C, E, annexed to Jackson Aff.

7. To the extent that money owed to the estate of a deceased shareholder did not exceed the amount of "key-man" life insurance RMJ had taken out on the life of the deceased shareholder, RMJ was to pay the amount owed in a single lump sum. To the extent that the sum owed exceeded the amount of "key-man" insurance, payment for the excess would be made in five annual installments, with payments not to exceed $20,000 per year exclusive of interest. The Agreement explicitly provided that in the event the excess owed over the insured amount exceeded $100,000, the payment period would extend beyond five years. In no event would the estate of a deceased shareholder receive less than the amount of "key man" insurance on his life. The shareholders stated their intention that insurance be taken out to fund any increase in the buy-out provisions. Furthermore, RMJ would endeavor to maintain an earned surplus sufficient to redeem stock pursuant to the terms of the redemption provisions, and if its surplus was insufficient for that purpose at a particular time, it would undertake all necessary and advisable steps to create such a surplus. This payment scheme remained essentially unchanged through each of the successive shareholder agreements and the November 1979 draft agreement. *Compare* Exhibits A–C, E, annexed to Jackson Aff.

8. The December 1975 agreement was silent as to a departing shareholder's right to dissolve the corporation in the event the corporation and the remaining shareholders refused to redeem his shares. This right is expressly conferred in the April 1976 agreement, and is preserved in both the April 1977 agreement and the November 1979 draft agreement. *Compare* Exhibits A–C, E, annexed to Jackson Aff.

The April 1977 Agreement also contained certain disability provisions, whereby a disabled shareholder would be entitled to his full commission earnings for a period of six months. If the disability continued beyond six months, then the shareholder would be entitled to receive one-half of his commission earnings for the second six months. If the disability continued into a second year, no further payments would be due and the shareholder would have the option to present his shares for redemption. After the second year of continued disability,

Any action of the Board of Directors required the President's affirmative vote to carry. In addition, the shares held by the President had to be voted affirmatively for any action at a shareholders' meeting to carry.[9]

Early in 1978 Jackson became an equal partner in RMJ. Also at that time, O'Connell was admitted into RMJ on an equal basis with the other shareholders. The April 1977 agreement was not immediately amended to reflect these events, but the unsigned November 1979 agreement does reflect these personnel changes.

McSharry was diagnosed with stomach cancer in May 1979 and underwent surgery for his condition. By late 1980, it was clear that McSharry's condition was terminal. At one point in March 1981, his doctors gave McSharry only twenty-four hours to live. He survived, however, for nearly two additional months, until May 2, 1981. Eugene Cates and Hugh McCarthy were named executors of the McSharry Estate. Cates and McCarthy presented McSharry's RMJ shares to the Company according to the terms of the Agreement. In August, 1981 the Estate was paid $228,892.60 in redemption of McSharry's shares. Of that amount, $78,892.60 represented McSharry's 20% interest in the book value of RMJ. In addition, the Estate received the $150,000 Goodwill factor provided for in the unsigned November 1979 agreement, and $130,320 in accumulated commission earnings, which were owed to McSharry.[10]

Roughly contemporaneously with McSharry's death and the redemption of his shares by RMJ, the remaining shareholders terminated O'Connell's employment and negotiated the buyback of his shares. O'Connell had become an equal shareholder in RMJ early in 1978. O'Connell's termination was carried out pursuant to two agreements between O'Connell and the remaining shareholders, exclusive of McSharry. Exhibits G, H, annexed to Jackson Aff. The first of these agreements was dated March 5, 1981, prior to McSharry's death, and the final agreement was dated September 30, 1981. RMJ redeemed O'Connell's shares in exchange for $350,000. The March 5, 1981 agreement acknowledged ongoing negotiations with Security Pacific Clearing & Services Corp. ("SPC") for the purchase of RMJ, and provided that if a contract for the sale of RMJ to SPC were signed on or before September 1, 1981, then O'Connell would share as an equal partner in the proceeds of that sale. The final employment termination agreement between O'Connell and RMJ characterized the $350,000 as payment for O'Connell's "interest in RMJ Securities Corp." [11] The agreement also notes that September 1, 1981 had passed without a contract for the sale of RMJ to SPC, and that O'Connell

RMJ would then have the option to require redemption of the shares. The disability provisions were absent from the original December 1975 agreement, but appeared in identical form in the April 1976 agreement, the April 1977 agreement, and in the November 1979 draft agreement. *Compare* Exhibits A–C, E, annexed to Jackson Aff.

9. The first agreement, dated December 1975, had provided that any affirmative action by the Board of Directors required a unanimous vote of the Board. The draft November 1979 agreement eliminated the requirement that the President vote affirmatively before an action could carry, reflecting the shareholders' agreement at an October 1979 meeting that majority rule would govern the actions of the Board of Directors and of the shareholders. *Compare* Exhibits A–C, E, annexed to Jackson Aff.

10. McSharry's accumulated commission earnings in fact amounted to $200,320. The amount paid to the estate, however, was reduced by $70,000: one-fifth of the $350,000 purchase price paid by RMJ to redeem O'Connell's shares pursuant to the employment termination agreements entered into between O'Connell and the surviving shareholders.

11. The March 5, 1981 agreement, in contrast, characterized the payment as $200,000 in redemption of O'Connell's shares, and $150,000 as a severance bonus. In light of the merger clause contained in the later agreement, specifically providing that "this agreement shall prevail should there be a contradiction between a prior agreement and this agreement," the characterization contained in the March agreement of the payment cannot be given any force. This Court considers the entire $350,000 payment to O'Connell to have been compensation for his holdings. This conclusion is reinforced by the tax treatment of the payment by both O'Connell and RMJ. *Compare* Exhibits G, H, annexed to Jackson Aff.

would not participate in any subsequent sale of RMJ.

Negotiations between RMJ and SPC began in December 1980, culminating in May 1982 with the sale of RMJ to SPC for $16,000,000. SPC management in April 1981 presented an offer for the acquisition of RMJ in exchange for $15,000,000 over a period of six years, contingent on RMJ meeting certain earnings goals.[12] On May 3, 1981, the day after McSharry's death, the RMJ shareholders held a special meeting at which they rejected SPC's offer. After receiving a counterproposal from Wunsch, SPC presented in a May 26, 1981 memorandum revised terms for the proposed acquisition. According to the revised acquisition terms, RMJ shareholders would receive $15,000,000 in cash three years after closing, subject to minimum average net after-tax profits over those three years. Exhibit C, annexed to Affidavit of Michael V. Caggiano, filed October 14, 1986 ("Caggiano Aff."). A June 4, 1981 meeting between the two companies ended in disarray when the RMJ shareholders could not agree among themselves whether to accept SPC's offer. Negotiations were formally broken off on July 9, 1981. Exhibit D, annexed to Caggiano Aff.

Negotiations resumed in September 1981, and the parties reached an agreement on pricing. The price remained at $15,000,000, with $6,000,000 to be paid at closing and the remainder three years later, subject to minimum after-tax earnings. Exhibit G, annexed to Caggiano Aff. The SPC Board of Directors approved the purchase of RMJ at its November 1981 meeting, and SPC filed for regulatory approval of the acquisition. The deal, however, fell through, and SPC withdrew its application for regulatory approval. Exhibit I, annexed to Caggiano Aff. Defendants assert that the cause of the failure was the con-

cern among RMJ shareholders that they were retaining insufficient control of their company to assure that the minimum earnings targets would be met and that they would receive their contingent payments. Discussions between RMJ and SPC were reopened a third and final time in January 1982. Exhibits J, K, annexed to Caggiano Aff. The parties agreed to terms for the acquisition and entered into a Stock Purchase Agreement in February 1982. According to the terms of the final agreement, the RMJ shareholders would receive $16,000,000 in exchange for their interest in RMJ. Eight million dollars would be paid at closing, and $8,000,000 three years later, contingent on RMJ attaining minimum earnings over the intervening period. Exhibit L, annexed to Caggiano Aff.

With the redemption of McSharry's shares completed in August 1981, and the buyback of O'Connell's shares completed in September 1981, only Wunsch, Jackson, Cates and Ryan participated in the sale of RMJ to SPC. On July 22, 1981, after McSharry's death but prior to the redemption of his shares from his Estate, the four remaining shareholders entered into an agreement among themselves to protect their own interests in RMJ in the event that any of them died. The July 22, 1981 agreement provided: (1) in the event of the death of a shareholder, his family would receive $1,000,000 in four annual installments of $250,000 per year; and (2) in the event of the sale of RMJ before December 31, 1982, the estate of a deceased shareholder would receive 25% of the aggregate sale price in redemption of his shares. Exhibit N, annexed to Affidavit of Harry L. Garman, filed October 14, 1986 ("Garman Aff.").

Frances Benson, a residuary beneficiary of McSharry's Estate, brought this action

---

**12.** Six million dollars would be paid at closing. An additional $6,000,000 would be paid in four equal annual installments of $1,500,000 subject to minimum after-tax earnings in 1981 and 1982. An additional $3,000,000 would be paid in $1,500,000 increments at the end of the fifth and sixth years subject to a minimum growth rate in after-tax earnings between 1982 and 1986 with pro rata reductions if the minimum

rate was not met. Exhibit A, annexed to Affidavit of Michael V. Caggiano, filed October 14, 1986 ("Caggiano Aff.").

Any offer presented by SPC management was subject to the approval both of SPC's Board of Directors and of the appropriate regulatory agencies, as well as to an independent audit of RMJ and a definite acquisition agreement. *Id.*

against Cates, Wunsch, Ryan, Jackson, and RMJ. Benson also named the McSharry Estate as a defendant in this action.[13] In her complaint, Benson alleges securities fraud in violation of section 10(b) of the Exchange Act of 1934 in the redemption of McSharry's shares to RMJ. She also claims that the shareholders' agreements were unenforceable as illegal restraints on alienation, that defendants had abandoned the agreements and were no longer bound by them, that defendants breached their fiduciary duties to plaintiff and to the Estate, and finally that defendants committed common law fraud against plaintiff and the Estate. Asserting that Benson lacks standing to assert a federal securities claim, that even if she has standing she cannot establish the requisite causation to make out a securities claim, and finally that the shareholders' agreements were binding and enforceable upon them, defendants seek summary judgment on all claims. Plaintiff Benson has cross-moved for summary judgment on her restraint on alienation, abandonment, and breach of fiduciary duty claims. The Estate has moved to be dropped as a party defendant, pursuant to Rule 21, Fed.R.Civ.P., and in the alternative has joined the other defendants in their motion for summary judgment of all claims.

## DISCUSSION

A court may grant the extraordinary remedy of summary judgment only when it is clear both that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. In deciding the motion, the Court is not to resolve disputed issues of fact, but rather, while resolving ambiguities and drawing reasonable inferences against the moving party, to assess whether material factual issues remain for the trier of fact. *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1570, 98 L.Ed.2d 762 (1987) (citing *Anderson v. Liberty Lob-*

*by, Inc.,* 477 U.S. 242, 247–250, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986)). While the party seeking summary judgment bears the burden of demonstrating the lack of material factual issues in dispute, *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9 (2d Cir.1983), "the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985) (per curiam).

Although the movant faces a difficult burden to succeed, motions for summary judgment, properly employed, permit a court to terminate frivolous claims and to concentrate its resources on meritorious litigation. *Knight v. U.S. Fire Ins. Co., supra,* 804 F.2d at 12. The motion then

> is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

As noted above, all parties in the instant case have moved or cross-moved for summary judgment. However, cross-motions for summary judgment do not warrant the granting of summary judgment unless the Court finds that "one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed." *Frouge Corp. v. Chase Manhattan Bank,* 426 F.Supp. 794, 796 (S.D.N.Y. 1976). *See also Bank of Am. Nat'l Trust*

---

**13.** Security Pacific Corp., originally named as a defendant in this action, has been dismissed by stipulation.

*and Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 716 (2d Cir.1985); *Schwabenbauer v. Board of Educ.*, 667 F.2d 305, 313–14 (2d Cir.1981); *Home Ins. Co. v. Aetna Casualty and Surety Co.*, 528 F.2d 1388, 1390 (2d Cir.1976).

### 1. *Plaintiff's Federal Securities Claim*

In her claim under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), and Rule 10b–5 promulgated thereunder, plaintiff Benson alleges that defendants made material omissions and misrepresentations in connection with the redemption of McSharry's stock with the intent to deceive plaintiff and the Estate as to the true value of McSharry's interest in RMJ. Complaint ¶ 22. In their motion for summary judgment on this claim, defendants assert that plaintiff, on the facts alleged, lacks standing to bring a securities claim against them. In the alternative, defendants argue that plaintiff can establish neither transaction causation nor loss causation, essential elements for a claim under section 10(b). The Court agrees that plaintiff lacks standing to bring her securities claim, and therefore grants summary judgment to defendants on this claim.

#### A. Standing

This Circuit in 1952 held that the class of plaintiffs who could bring an action for securities fraud under section 10(b) was limited to purchasers and sellers of the securities in question. *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). The Supreme Court upheld this rule in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). In *Blue Chip Stamps*, the defendant had been compelled, pursuant to an antitrust consent decree, to issue new shares and offer them at a bargain price to a small class of businesses that had been injured by its prior anticompetitive conduct. Plaintiff, a member of the class of offerees, alleged that it had declined to purchase the offered shares be-

cause the prospectus prepared by defendant in connection with the offer had been misleadingly pessimistic in assessing the value of the shares. The Court concluded that the disadvantages of imposing the purchaser-seller restriction on actions under section 10(b) and Rule 10b–5 were outweighed by the countervailing advantages of the limitation,[14] and ruled that because the plaintiff had neither purchased nor sold any shares in reliance on the allegedly misleading prospectus, it could not maintain its action under section 10(b). *Id.* at 749, 95 S.Ct. at 1931–32.

■ This Court recognizes that section 10(b) and Rule 10b–5 are to be read flexibly, not technically and restrictively. *See, e.g., Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971). This Circuit has recognized that trust beneficiaries have standing to pursue actions under section 10(b) against the fund trustees based on fraudulent transactions between the trustees and third parties. *Kirshner v. United States*, 603 F.2d 234, 240 (2d Cir.1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979); *Klamberg v. Roth*, 425 F.Supp. 440, 441 (S.D.N.Y.1976); *Selzer v. Bank of Bermuda, Ltd.*, 385 F.Supp. 415, 419 (S.D.N.Y. 1974). Although the plaintiff beneficiaries in these actions were not themselves purchasers or sellers in the allegedly fraudulent transactions, the Second Circuit recognized their standing to bring their securities claims by analogy to shareholders in a corporation, who are permitted to pursue federal securities fraud claims in derivative suits on behalf of the corporation. *Kirshner v. United States, supra*, 603 F.2d at 240.

■ In contrast to trust beneficiaries, beneficiaries under a will have been denied standing to bring an action against third parties who entered into an allegedly fraudulent transaction for the purchase or sale of securities with the representatives

---

**14.** The harshness of restricting the class of potential plaintiffs is mitigated by the ability of non-selling shareholders and others to bring derivative actions against corporate insiders on behalf of a defrauded corporation, and by the availability of state law remedies to non-purchasers and non-sellers. *Id.* 421 U.S. at 738 n. 9, 95 S.Ct. at 1927 n. 9.

of an estate. *Kerrigan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 450 F.Supp. 639, 647 (S.D.N.Y.1978). *See also Miller v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 572 F.Supp. 1180, 1186 (N.D.Ga.1983) (heir has no standing to represent estate in securities action). The distinction between trust beneficiaries and beneficiaries under a will is reasonable and will be maintained by this Court. This Court will not extend the derivative suit analysis to this case where a beneficiary under a will seeks to bring suit on behalf of the estate. *See Heyman v. Heyman*, 356 F.Supp. 958, 966 n. 10 (S.D.N.Y.1973) (beneficiary of testamentary trust was not entitled to bring derivative action on behalf of estate).

The analogy to stockholder derivative suits, though appropriate for trust beneficiaries, should not be applied to beneficiaries under a will. A shareholder derivative suit is based in part on organizational considerations; a corporation has a life of potentially infinite duration, and the first duty of corporate officers is to their shareholders. Where a corporation has a cognizable claim that its officers refuse to pursue, then a mechanism is available for shareholders to pursue that claim on behalf of the corporation. Similarly, a trust ordinarily is of extended duration, and a trustee's primary obligation is to the beneficiaries. *In re Runals' Estate*, 68 Misc.2d 967, 328 N.Y.S.2d 966 (Surr.Ct.1972). It is reasonable, then, that a trust beneficiary be able to challenge allegedly fraudulent transactions carried out by the trustee. The administration of a will, by contrast, is meant to be of a limited duration, the primary obligation of the administrator being to wind up the affairs of the estate and to carry out the wishes of the testator. *See, e.g., In re Larson's Estate*, 87 Misc.2d 397, 402, 385 N.Y.S.2d 720, 724 (Surr.Ct.1976); *In re Stubing's Estate*, 47 Misc.2d 174, 175, 261 N.Y.S.2d 914, 915 (Surr.Ct.1965).

This Court, therefore, will not extend the trust beneficiary cases to recognize plaintiff's standing to bring a federal securities action challenging the allegedly fraudulent redemption of McSharry's RMJ shares. As a beneficiary under the will, plaintiff was neither a purchaser nor a seller in the challenged transaction, and she is not entitled to bring an action on behalf of the Estate.

*Heyman v. Heyman, supra*, 356 F.Supp. 958, is not to the contrary. In *Heyman* the plaintiff was the beneficiary of a testamentary trust established by her father in his will and to be funded by the sale of his stock in a closely-held family business. A shareholders' agreement provided that, upon the death of a shareholder, the corporation would redeem his shares at "fair value." *Id.* at 960. Plaintiff alleged that the redemption price was based not on the "fair value" of the shares, as provided for in the shareholders' agreement, but rather on the book value of the corporation. *Id.* at 961. Plaintiff brought a securities claim under section 10(b) against the trustee, the executors of her father's will, and the remaining shareholders of the company, with pendent state law claims. *Id.*

The *Heyman* court, having identified the policy behind *Birnbaum* to be preventing suits under section 10(b) based on mere corporate mismanagement and avoiding an avalanche of litigation by defrauded shareholders, decided that granting standing to Ms. Heyman would do no violence to this policy. *Id.* at 964–65. The court noted that although Ms. Heyman was not the nominal seller, she was the beneficiary of the sale. Ms. Heyman, then, had a nexus to the transaction that had been missing in *Birnbaum* and in the cases following it. *Id.* at 965.

The plaintiff in *Heyman*, as in *Kirshner* and the cases following it, was a trust beneficiary, not simply a beneficiary under a will. *Heyman* is best understood on this basis, and not on the basis of the plaintiff's "nexus" to the transaction. As trust beneficiary, Ms. Heyman was entitled to bring her action in the nature of a derivative suit on behalf of the trust. It is not enough to confer standing in an action under section 10(b) that plaintiff can establish a "nexus" to the transaction. In *Bolger v. Laventhol, Krekstein, Horwath & Horwath*, 381 F.Supp. 260 (S.D.N.Y.1974), for example, limited partners were denied standing under section 10(b) to challenge purchases

and sales of securities made by the general partners for the partnership portfolio. *Id.* at 267. "*Birnbaum* would be completely eviscerated if a person who himself neither bought nor sold securities could be characterized as a purchaser or seller merely because of his relationship to the *actual* purchaser or seller." *Id.* (emphasis in original). The *Bolger* court rejected the analogy offered by the plaintiffs to the line of cases recognizing standing in trust beneficiaries. *Id.* Likewise, this Court refuses to extend the trust beneficiary cases to a case involving a beneficiary under a will.

This Court's conclusion that plaintiff lacks standing to proceed with her federal securities claim is not to suggest that the facts alleged in her complaint do not make out an injury. It is simply not the type of injury meant to be addressed by the federal securities laws. The fundamental purpose of the 1934 Act is to promote full disclosure in securities transactions. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972). Specifically, Rule 10b–5 is designed to foster disclosure of material information to purchasers and sellers of securities in order to permit an informed investment decision by the investor. *Kerrigan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 450 F.Supp. 639, 643 (S.D.N.Y.

1978). These purposes would not be furthered if this Court were to grant standing to plaintiff to pursue her securities claim.[15] Plaintiff did not participate in the redemption transaction. She cannot rightly complain under Rule 10b–5 that one party to the transaction improperly kept material information from the other. To the extent that plaintiff alleges self-dealing and breach of fiduciary duty, her claims are clearly outside the scope of section 10(b). *Id.* at 647. A court should hesitate to recognize an implied cause of action under circumstances that at best only peripherally implicate the purposes behind the statute in question. *See, e.g., Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 478, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977).

### B. Causation

But even if plaintiff did have standing to bring her securities claim, her claim would be dismissed for failure to show causation. It is well established that civil liability under section 10(b) requires "causation not merely in inducing the plaintiff to enter into a transaction or series of transactions, but causation of the actual loss suffered." *Manufacturers Hanover Trust Co. v. Drysdale Securities Corp.,* 801 F.2d 13, 20 (2d Cir.1986) (citing cases), *cert. denied,* —— U.S. ——, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1986). *Accord, Bennett v. United*

---

**15.** This Court rejects the reasoning, though not necessarily the result, set forth by the Sixth Circuit in *James v. Gerber Prods. Co.,* 483 F.2d 944 (6th Cir.1973), where the court held that the beneficiary of a testamentary trust did have standing under Rule 10b–5 to pursue a fraud claim against the trustee. To support its conclusion that the beneficiary had standing to bring the action, the court reasoned that:

[S]eparating the legal and beneficial incidents of ownership in the property is a mere technical argument since there is only one interest at stake and that is the beneficiary's. No one here argues that if the trustee had been defrauded into selling the shares, it could not initiate an action for relief under 10b–5. But of course, if the trustee was a party to any fraud, it could scarcely be expected to institute such an action. Consequently, were we to accept the [trustee's] argument, we would be faced with an unacceptable situation where alleged fraudulent securities transactions occurred which, if true, are prohibited by federal statute and regulation but the party in interest who actually suffered the fraud would

be without an avenue of redress in the federal courts.

*Id.* at 949. On the contrary, this Court perceives a fundamental distinction between the two situations posed by the *James* court: a distinction going to the basic purpose of the federal securities laws. Where a trustee engages knowingly in a fraudulent transaction with a third party to the injury of the beneficiary, all parties to the transaction shared full knowledge of all its material terms. As the Seventh Circuit explained in *O'Brien v. Continental Illinois Nat. Bank and Trust,* 593 F.2d 54 (7th Cir.1979), when it denied standing to managers of pension trust funds who had turned over the funds to the defendant bank for investment:

[T]here was no investment decision to be made by plaintiffs and no such decisions were affected by any lack of information on plaintiffs' part. The "market transactions" were pure; the trust relationships allegedly were not. Rule 10b–5, however, protects the former and not the latter.

*Id.* at 60 (quoting lower court decision granting motion to dismiss).

*States Trust Co.,* 770 F.2d 308, 313 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986).

Consequently, courts in this Circuit have dismissed federal securities actions based on an alleged unfair price where the plaintiff was required to sell pursuant to a valid shareholders agreement. In *Ryan v. J. Walter Thompson Co.,* 453 F.2d 444 (2d Cir.1971), *cert. denied,* 406 U.S. 907, 92 S.Ct. 1611, 31 L.Ed.2d 817 (1972), for example, the plaintiff had been a vice president of J. Walter Thompson ("JWT") and held JWT stock pursuant to an employee stock ownership plan. JWT was a closely held corporation with stock ownership limited to its employees. JWT retained the option to purchase at net asset value stock held by employees upon the employees' retirement. Ryan retired in January of 1966, after which JWT exercised its repurchase option. Five months after JWT acquired Ryan's shares at their net asset value of $276,200, JWT went public, at which time Ryan's shares would have been worth $970,650. *Id.* at 446.

Ryan alleged that JWT withheld from him its plans to conduct a public offering. The Second Circuit upheld the district court's dismissal of Ryan's securities claim under Rule 10b–5, noting that Ryan had failed to allege that information regarding JWT's proposed public offering would have altered his plans to retire. "[S]ince Ryan was obligated to sell his shares to JWT ..., whatever he knew or did not know regarding JWT's plans to go public was irrelevant." *Id.* at 447. *Accord, Fershtman v. Schectman,* 450 F.2d 1357, 1360 (2d Cir. 1971) ("With respect to [causation], if [general partners] were legally entitled to terminate the partnership ... in their sole discretion, it would make no difference what they misrepresented or concealed...."), *cert. denied,* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972); *Goldberg v. United Parcel Service,* 605 F.Supp. 588, 591 (E.D.N.Y.1985) (all em-

ployees required by terms of trust agreement to sell their stock back to the company upon termination of employment); *Keating v. B.B.D.O. Int'l, Inc.,* 438 F.Supp. 676, 681 (S.D.N.Y.1981) (because plaintiff was obligated to sell his shares back to the company upon the termination of his employment, what he did or did not know was irrelevant); *Standard Metals Corp. v. Tomlin,* 503 F.Supp. 586, 599–600 (S.D.N.Y.1980) ("[P]urchasing party's misrepresentations or omissions are irrelevant where the selling party is obliged to sell its shares. Whatever deficiencies or misrepresentations there were in [defendant's] disclosure could not have affected plaintiff, for plaintiff had the legal obligation to sell the shares at the predetermined price.").

Plaintiff asserts, though, that the mandatory buyback provision in the RMJ shareholders agreement was unenforceable, and therefore the McSharry Estate was not obligated to sell McSharry's shares back to RMJ. Plaintiff puts forward two alternative theories upon which she claims that the mandatory buyback was invalid. First, she asserts that the buyback provisions constitute an unreasonable restraint on alienation under state law. Second, she asserts that the agreement had been abandoned by the parties. Plaintiff argues that had she been informed of the ongoing negotiations between RMJ and SPC, she would have attempted to enjoin the redemption of McSharry's shares by RMJ. Under this scenario, the withholding of information relating to the impending sale of RMJ to SPC becomes a material omission, proximately causing the loss alleged by plaintiff.

 Under certain circumstances courts have recognized that the availability of a remedy under state law to enjoin an allegedly fraudulent transaction may satisfy the causation requirement of section 10(b), notwithstanding that the consent of the complaining party was not required for the transaction itself.[16] To establish causa-

16. In *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), for example, the Supreme Court rejected a fraud claim by minority shareholders who claimed they received an unfair price in a short form merger, which had been accomplished by the majority shareholder without the prior consent of the minority. The Court noted that under

tion under this theory, however, a plaintiff must do more than simply assert that she would have sought to enjoin a transaction under state law if certain relevant information had been disclosed to her. She must show by a fair preponderance of the evidence that she would have succeeded in preventing the loss she in fact suffered. *Madison Consultants v. Federal Deposit Ins. Corp.*, 710 F.2d 57, 65 (2d Cir.1983). *See also Kerrigan v. Merrill Lynch, Pierce, Fenner & Smith, supra,* 450 F.Supp. at 646 ("[T]he simple ability to bring a suit attempting to establish new [state] law ... cannot be sufficient to establish materiality under Rule 10b–5, for under that logic, every seller, no matter how clear his legal obligation to sell under state law, could later challenge the disclosure surrounding the transaction in federal court."). As discussed more fully below, *see* Part 2A and Part 2B, *infra,* plaintiff would not prevail on her unreasonable restraint on alienation claim or on her abandonment claim.[17] Plaintiff's assertion of a

state court remedy, therefore, does not in this case satisfy the causation requirements of section 10(b).

Even in the event that plaintiff had been able to satisfy her burden of showing by a preponderance of the evidence that she would succeed in a state court action, it is not at all clear under the facts of this case that an available injunctive remedy under state law would satisfy section 10(b)'s causation requirement. This theory was developed in the context of shareholder derivative actions, where shareholders in a corporation have been permitted to bring suit on behalf of the corporation against corporate insiders and third parties accused of defrauding the corporation. Its applicability is questionable here, where a beneficiary under a will is suing an executor and third parties, claiming that defendants have defrauded the Estate.[18]

The Second Circuit has allowed a derivative action to proceed on a securities fraud theory only after determining that the cor-

---

Delaware law, plaintiffs were limited to an appraisal remedy. Where plaintiffs could not have enjoined the merger, defendants' "failure to give advance notice was not a material nondisclosure within the meaning of [section 10(b)] or [Rule 10b–5]." *Id.* at 474 n. 14, 97 S.Ct. at 1301 n. 14. *See also Goldberg v. Meridor,* 567 F.2d 209, 219 (2d Cir.1977) (recognizing that under New York law, unlike the Delaware law at issue in *Santa Fe,* appraisal was not the exclusive remedy available to minority shareholders, but injunctive relief was available), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978); *Bolton v. Gramlich,* 540 F.Supp. 822, 837 (S.D.N.Y.1982) ("[T]he ability of shareholders to enjoin the proposed action supplies the causal link between material nondisclosure and injury to the issuer, for unless disclosure would have enabled the issuer to avoid the injury, nondisclosure cannot be considered the source of the harm.").

**17.** Plaintiff asserts two additional state law claims, based on defendants' alleged breach of fiduciary duty and on common law fraud. Neither of these claims, however, would entitle plaintiff to injunctive relief if she were to prevail on them, but only money damages. Accordingly, plaintiff cannot base causation on either of these claims. *See Santa Fe Indus., Inc. v. Green, supra,* 430 U.S. at 474 n. 14, 97 S.Ct. at 1301 n. 14; *Coons v. Kidder, Peabody & Co.,* 539 F.Supp. 1145, 1149 (S.D.N.Y.1982) ("If plaintiffs could circumvent the causation requirement by speculating about state actions they might have

pursued if not for the alleged misrepresentations, when such actions could effect [sic] the price but not the transfer of stock, § 10(b) would become a vehicle for transporting novel questions of state law to the federal courts.").

**18.** *Klamberg v. Roth,* 473 F.Supp. 544 (S.D.N.Y. 1979) is not to the contrary. In *Klamberg* an employee beneficiary of a pension trust sued the trustees, who were also officers of the employer company. The trustees were named by the company and were specifically empowered to invest trust assets in company stock. The trustees were not consulted as to the investment of trust assets, nor were they specifically informed of individual transactions. The trustees invested about 80% of the trust assets in the company's stock, after which the stock declined precipitously in value, causing substantial losses to the trust.

The court held that a trust beneficiary is entitled to bring a Rule 10b–5 action against its trustee if the beneficiary was in a position to seek to enjoin the trustee's impending purchase or sale of securities. *Id.* at 551. As discussed above, this Circuit permits trust beneficiaries to bring securities fraud actions in the nature of derivative actions. It follows that the case law relating to causation in shareholder derivative actions has been applied where a trust beneficiary sues on behalf of the trust. This Court declines to extend *Klamberg* to the present case where a beneficiary under a will seeks to bring an action on behalf of the Estate.

poration had been defrauded by its controlling shareholders. *Goldberg v. Meridor*, 567 F.2d 209, 217 (2d Cir.1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed. 2d 771 (1978). If the withheld information had been available to the corporation, it presumably would not have entered into a transaction adverse to its interests. *Id.* This reasoning forms the basis of the court's conclusion in *Goldberg* that the plaintiff shareholders had satisfied the causation requirement of their federal securities claim. It was only in the alternative that the court noted plaintiffs would themselves have had a remedy under state law if the alleged facts had been disclosed. *Id.* at 219. *See also SEC v. Parklane Hosiery Co.*, 558 F.2d 1083, 1088 (2d Cir.1977); *Schoenbaum v. Firstbrook*, 405 F.2d 215 (2d Cir.1968), *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Bolton v. Gramlich*, 540 F.Supp. 822 (S.D.N.Y.1982). One court in this district interpreted these cases to stand not for the proposition that the availability of a state injunctive remedy satisfies the causation requirement, but rather that the causation requirement is relaxed in a shareholder derivative suit. *Coons v. Kidder, Peabody & Co.*, 539 F.Supp. 1145, 1149 (S.D.N.Y.1982).

For all the foregoing reasons, plaintiff has failed to show the causation necessary for a 10b–5 claim. Accordingly, even if she did have standing to bring the action, she would not be permitted to proceed on her federal securities claim.

### 2. *Plaintiff's State Law Claims*

The Court turns next to plaintiff's state law claims. These claims are before the Court pursuant to its diversity jurisdiction under 28 U.S.C. § 1332. Plaintiff asserts that the mandatory redemption provision contained in the Shareholders' Agreement is unenforceable as part of an illegal restraint on alienation. Further, she contends that the Agreement was unenforceable on the ground that it was abandoned by all the shareholders. Plaintiff also claims that defendants breached their fiduciary

duty both to her and to the McSharry Estate in withholding important information and in enforcing the mandatory redemption at a grossly inadequate price. Finally, plaintiff claims that defendants have committed common law fraud against her and against the McSharry Estate.

### A. Illegal Restraint on Alienation Claim

Plaintiff alleges that the provision in the Shareholders' Agreement prohibiting the transfer of shares by any RMJ shareholder without the unanimous consent of the other shareholders is unenforceable under New York law as an unreasonable restraint on alienation. Complaint ¶¶ 24–27. Further, plaintiff contends that the mandatory redemption provision must also fall because it is inextricably linked to the challenged consent requirement for *inter vivos* transfers.[19] Because the Court concludes that the consent requirement at issue in this case is reasonable, it need not consider the second prong of plaintiff's argument.

▇▇▇ The general rule in New York is that a restraint on the alienation of corporate stock is enforceable so long as it "effectuates a lawful purpose, is reasonable, and is in accord with public policy." *Levey v. Saphier*, 54 A.D.2d 959, 960, 388 N.Y.S. 2d 644, 645 (1976) (citing cases). A first option clause is considered reasonable regardless of the corporate purpose, for it does not prevent transfer, but merely delays transfer for a limited time. *Ryan v. J. Walter Thompson Co., supra*, 453 F.2d at 446. *See also Globe Slicing Machine Co. v. Hasner*, 333 F.2d 413, 415 (2d Cir.1964), *cert. denied*, 379 U.S. 969, 85 S.Ct. 666, 13 L.Ed.2d 562 (1965); *Martin v. Graybar Elec. Co.*, 285 F.2d 619, 625 (7th Cir.1961) (applying New York law); *Allen v. Biltmore Tissue Corp.*, 2 N.Y.2d 534, 542–43, 141 N.E.2d 812, 816–17, 161 N.Y.S.2d 418, 423–24 (1957). More restrictive restraints on alienation are upheld if they are reasonable, *In re Darman*, 105 A.D.2d 1028, 483 N.Y.S.2d 469 (1984); *Levey v. Saphier, su-*

---

**19.** Plaintiff does not argue that the mandatory redemption at death was itself and by its own terms illegal. *See, e.g., Isaacson v. Beau Label Corp.*, 93 A.D.2d 880, 461 N.Y.S.2d 420 (1983) (absent any allegation of fraud, duress or undue influence, mandatory buyback at death is valid and enforceable).

*pra,* 54 A.D.2d 959, 388 N.Y.S.2d 644; *Penthouse Properties, Inc. v. 1158 Fifth Avenue, Inc.,* 256 A.D. 685, 11 N.Y.S.2d 417 (1939), and will be declared invalid only if unreasonable or against public policy. *See Quinn v. Stuart Lakes Club, Inc.,* 57 N.Y.2d 1003, 443 N.E.2d 945, 457 N.Y.S.2d 471 (1982); *Rafe v. Hinden,* 29 A.D.2d 481, 288 N.Y.S.2d 662, *aff'd,* 23 N.Y.2d 759, 244 N.E.2d 469, 296 N.Y.S.2d 955 (1968).

■ The restriction that plaintiff challenges in this case provides that no shareholder "shall, without the consent of the others, encumber or dispose of the shares of stock of the Corporation now owned or hereafter acquired." Exhibit C, annexed to Jackson Aff., ¶ 5. This consent requirement, though, must be considered in the context of the Agreement as a whole, with the specific nature and operation of RMJ in mind. RMJ was a small, closed corporation established by McSharry and managed by its five (or, for a time, six) shareholders. According to the terms of the Shareholders' Agreement, the status of the principals as officers, directors, and shareholders was inextricably connected. The only circumstances under which one of the principals would seek to sell his shares would be a withdrawal from the company. None of the principals had a right to employment at RMJ independent of his status as shareholder. Paragraph nine of the April 1977 Agreement provided that if a shareholder were terminated for reasons other than death or disability, then RMJ would redeem his shares within sixty days from the date of the termination of employment. If RMJ failed to redeem the shares within the specified time, then the remaining shareholders would be granted an additional sixty-day period to purchase the shares of the terminated employee. If neither RMJ nor the remaining shareholders exercised their options to purchase, then RMJ would be dissolved "with due dispatch." *Id.* ¶ 9. Paragraph eight provided that the price of a buy-out of a terminated shareholder "shall be the same as that provided for in the event of death," that is, book value plus the Goodwill factor provided for in the Agreement. *Id.* ¶ 8.

The parties agree that the leading case in New York regarding the enforceability of restraints on alienation of corporate stock is *Allen v. Biltmore Tissue Corp., supra,* 2 N.Y.2d 534, 141 N.E.2d 812, 161 N.Y.S.2d 418. In *Allen,* the New York Court of Appeals approved a provision in the corporate bylaws granting the corporation a ninety-day option to repurchase at the original issue price the shares of any shareholder who wished to transfer or sell his shares, or upon the shareholder's death. The court explained that restrictions on transfer were not illegal, but only prohibitions against transferability. *Id.* at 542, 141 N.E.2d at 816, 161 N.Y.S.2d at 423. Accordingly, the court cautioned, it would strike down a provision if it "render[ed] the sale of the stock impossible to anyone except to the corporation at whatever price it wished to pay." *Id.* at 542, 141 N.E.2d at 816, 161 N.Y.S.2d at 423. The court recognized the "social utility" of the restraint on transfer before it, and refused to entertain a challenge to the ninety-day option provision on the ground of an allegedly unfair price. *Id.* at 542–43, 141 N.E.2d at 816–17, 161 N.Y.S.2d at 423–24.

*Rafe v. Hinden, supra,* 29 A.D.2d 481, 288 N.Y.S.2d 662, involved just the situation foreseen and condemned by the *Allen* court. In *Rafe,* the Appellate Division declared unenforceable an agreement between two shareholders providing that the shares held by each of them were transferable only to the other, and requiring written permission of the other before any transfer to a third party was permitted. *Id.* at 484–85, 288 N.Y.S.2d at 665. The agreement did not set a price at which the defendant was required to purchase, no time limit was set for the defendant to exercise his option to purchase, and there was nothing to prevent the defendant from unreasonably withholding his consent from a sale to a third party. *Id.* at 483, 288 N.Y.S.2d at 664. The court declared the provision illegal because it "render[ed] the sale of the plaintiff's stock impossible to anyone except to the individual defendant at whatever price he wishe[d] to pay." *Id.* at 485, 288 N.Y.S.2d at 666.

In contrast to *Rafe,* severe restrictions on the transferability of stock have been upheld where they serve a legitimate corporate purpose, where they are reasonable, and where they are not against public policy. In *Levey v. Saphier, supra,* 54 A.D.2d 959, 388 N.Y.S.2d 644, for example, the Appellate Division upheld an agreement whereby the purchasers of two blocks of stock in a closed corporation were prohibited from selling the shares for ten years, and at any time during the ten-year period the sellers had the right to repurchase the shares at the original sales price. The court found the agreement reasonable in light of the circumstances and the purposes sought to be accomplished. *Id.* at 960, 388 N.Y.S.2d at 645. The agreement served the important corporate purpose of resolving an irreconcilable dispute among the company's five shareholders. One faction agreed to relinquish its control over the company in exchange for the opportunity to participate in profits should the company prosper. The remaining shareholders were relieved of the continuing controversy and were able to focus on the company's business. The court held this reason sufficient to justify the ten-year prohibition on transfer provided for in the agreement. *Id.* at 960, 388 N.Y.S.2d at 645.

In the special context of cooperative housing, consent requirements have been upheld, even absent a resale price guarantee. In *Penthouse Properties, Inc. v. 1158 Fifth Avenue, Inc., supra,* 256 A.D. 685, 11 N.Y.S.2d 417, the court recognized that the corporate organization of a cooperative apartment building is "a vehicle for the establishment of a community of homes rather than for the purpose of pecuniary profit to the stockholders." *Id.* at 692, 11 N.Y.S.2d at 423. In light of the special purposes of a residential cooperative, the imposition of a consent requirement on shareholders was reasonable. *See also Lacaille v. Feldman,* 44 Misc.2d 370, 253 N.Y.S.2d 937, 945–47 (Sup.Ct.1964).

Similarly, recognizing the special nature and purposes of a closely-held corporation, this Court is unwilling to hold that the consent requirement contained in paragraph five of the Shareholders' Agreement

was unreasonable and therefore void. Accordingly, summary judgment is granted to defendants on plaintiff's restraint on alienation claim, and summary judgment is denied to plaintiff on this claim.

### B. Abandonment Claim

■ Plaintiff further asserts that the mandatory buyback provision of the Shareholders' Agreement is unenforceable because it was abandoned by the parties to the Agreement. Plaintiff does not argue that the mandatory buyback upon death was itself abandoned by the RMJ shareholders. Rather, she presents a two-part argument. First, she claims that in their daily course of dealings the shareholders conducted their business in such a way as to repudiate several provisions of the Agreement. Second, she claims that the mandatory buyback is nonseverable from the abandoned provisions and was, therefore, abandoned as well. Because the Court determines that the shareholders had not abandoned any portion of the Agreement, it need not address plaintiff's nonseverability argument.

The Second Circuit in *Armour & Co. v. Celic,* 294 F.2d 432 (2d Cir.1961), set forth the law in New York State regarding abandonment of contracts. Abandonment by conduct is recognized only where the conduct is mutual, positive, unequivocal, and inconsistent with the intent to be bound.

> [T]he rescission of a contract by abandonment requires mutual assent of the parties. The abandonment of a contract can, of course, be inferred from attendant circumstances and conduct of the parties. Where conduct is relied upon to establish the abandonment, the acts of the parties must be positive, unequivocal and inconsistent with an intent to be further bound by the contract. The termination of a contract is not presumed, and the burden of establishing it rests upon the party who asserts it.

*Id.* at 435–36 (citations omitted). *Accord Atlantic Co. v. Jarll Realty Corp.,* 36 A.D. 2d 883, 884, 320 N.Y.S.2d 769, 770 (1971).

Plaintiff relies on several events and circumstances to support her assertion that

the Shareholders' Agreement was abandoned prior to McSharry's death. *See* Garman Aff. ¶¶ 32, 33; Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment at 4–6. None of these events or circumstances, however, point positively and unequivocally to an intention on the part of *all* signatories to abandon the Shareholders' Agreement. *See Armour & Co. v. Celic, supra,* 294 F.2d at 437.

Many of the cited incidents were not unanimous, but involved fewer than the entire number of shareholders.[20] Furthermore, those events in which all shareholders did participate fall short of demonstrating a positive and unequivocal intent to abandon the Agreement.[21] They can be viewed, to the contrary, as a series of waivers and modifications of the Agreement, especially in light of defendants' testimony that they believed they were bound by the terms of the successive agreements.[22] These events, whether they are considered individually or collectively, fail to provide the requisite unequivocal evidence of a unanimous intent to abandon the Agreement. As a matter of law and based on the undisputed facts of the case, plaintiff has failed to meet her burden to prove that the RMJ partners had abandoned their Agreement. Accordingly, the Court grants defendants' motion for summary judgment on plaintiff's abandonment claim and denies plaintiff's motion for summary judgment on this claim.

## C. Fiduciary Duty Claims

Plaintiff alleges that defendants breached their fiduciary duty both to the McSharry Estate and to plaintiff herself in omitting to state material facts and in purchasing McSharry's shares at a grossly unfair price. Complaint ¶¶ 33, 34. Specifically, plaintiff alleges that defendants failed to disclose that the value of McSharry's holdings was grossly in excess of the amount paid to the Estate, and that the sale of RMJ was purposefully delayed until after the redemption of McSharry's shares. *Id.* ¶ 21.[23]

The shareholders in a closely held corporation share a fiduciary duty among themselves. *E.g., Petition of Levitt,* 109 A.D.2d 502, 511, 492 N.Y.S.2d 736,

---

**20.** For example, defendants' management of RMJ by majority rule without the affirmative vote of McSharry as required by the Agreement, while McSharry was disabled and not participating in management, are actions that were carried out, by definition, without McSharry's participation.

**21.** For example, O'Connell's admission into RMJ and Jackson's elevation to full and equal partner in 1984, without any amendment to the Agreement reflecting these changes, fail to demonstrate the requisite unequivocal intent to abandon the Agreement. On the contrary, especially in light of the November 1979 Agreement, which, though never executed by the parties, was prepared at their direction, and which does reflect the equal six-way distribution of shares in RMJ, these actions are entirely consistent with an intent to waive temporarily certain particular provisions of the Agreement while preserving the remaining provisions intact.

Similarly, O'Connell's termination on consent of the parties on terms more favorable than those called for in the Agreement is in no way inconsistent with an intent to preserve the Agreement as a framework for further dealings among the remaining partners. The continuation of full profit distributions to McSharry after he became ill, beyond the time called for in the Agreement, can likewise form no basis for a conclusion that the parties had abandoned the Agreement.

The Court recognizes that in the real world, the principals in a closely held company must have some latitude to diverge, upon mutual consent, from the strict terms of a shareholder agreement, without jeopardizing the agreed-upon framework for their future dealings and the very corporate organization of their enterprise.

**22.** The shareholders believed that their actions were governed by the April 1979 draft agreement, and by earlier agreements on issues not covered in the draft agreement. *See, e.g.,* Deposition of Eugene Cates at 67–72, 85, 172 (taken March 25, 1986) ("Cates Dep."); Deposition of Paul H. Ryan at 89–90, 106–07 (taken November 26, 1985) ("Ryan Dep."); Deposition of George J. Wunsch at 58–59 (taken December 13, 1985) ("Wunsch Dep."); Deposition of Richard Jackson at 227–28 (taken November 15, 1985) ("Jackson Dep.").

**23.** Plaintiff further alleges a failure to disclose that the Agreement was void as an illegal restraint on alienation, and that it had been abandoned by the shareholders. Complaint ¶ 21. Because of the Court's resolution of these issues, *supra,* these allegations need not be discussed further.

742 (1985); *Fender v. Prescott*, 101 A.D.2d 418, 422, 476 N.Y.S.2d 128, 132 (1984), *aff'd*, 64 N.Y.2d 1077, 479 N.E.2d 225, 489 N.Y.S.2d 880 and 64 N.Y.2d 1079, 479 N.E.2d 249, 489 N.Y.S.2d 904 (1985); *In re T.J. Ronan Paint Corp.*, 98 A.D.2d 413, 421, 469 N.Y.S.2d 931, 936 (1984). Thus, defendants Wunsch, Cates, Ryan and Jackson owed McSharry, and by extension his Estate, a duty to deal fairly, in good faith, and with loyalty. *Croce v. Kurnit*, 565 F.Supp. 884, 892 (S.D.N.Y.1982), *aff'd*, 737 F.2d 229 (2d Cir.1984). *See also Laub v. Genway Corp.*, 60 F.R.D. 462, 466–67 (S.D. N.Y.1973) ("[F]iduciary is held to 'the punctilio of an honor the most sensitive.' ").[24] Transactions between fiduciaries are to be scrutinized with extreme vigilance, and a court requires clear evidence that a particular transaction was understood by the parties and that there was no fraud, mistake or undue influence. Absent clear proof of the integrity and fairness of a transaction between fiduciaries, it will be set aside or held invalid between the parties. *Gordon v. Bialystoker Center and Bikur Choklim, Inc.*, 45 N.Y.2d 692, 698, 385 N.E.2d 285, 288, 412 N.Y.S.2d 593, 596–97 (1978).

■■■■ Both plaintiff and defendants seek summary judgment of plaintiff's breach of fiduciary duty claims. Because there are unresolved issues of material fact, the Court denies summary judgment to all parties. This Court holds that a reasonable jury could find that the redemption transaction was unfair, that the defendants failed to inform McSharry and the Estate that the value of his shares was grossly in excess of the amount paid to the Estate, and that the sale of RMJ to SPC was delayed until after the redemption of McSharry's shares. Proof of any of these allegations could form the basis for a claim of breach of fiduciary duty.[25]

The very considerations that lead this Court to reject plaintiff's restraint on alienation and abandonment claims compel the Court to recognize, at least at this stage of the proceeding, her claim that the redemption transaction was unfair. In the face of their frequent modifications and waivers of the Agreement, defendants cannot now put forward that Agreement as an asserted impediment to their having purchased McSharry's shares at a price higher than the redemption price set out in the Agreement.

Having bought out O'Connell prior to McSharry's death at terms which varied substantially from those spelled out in the

---

**24.** Because plaintiff, as a residuary beneficiary of the Estate and not a specific legatee of the RMJ shares, never possessed an interest in McSharry's RMJ shares themselves, she cannot claim that the remaining shareholders owed a fiduciary duty directly to her. She does, however, as a true party in interest who alleges an injury capable of judicial redress from the alleged breach of defendants' duty to McSharry, have standing to bring a state law breach of fiduciary duty action on behalf of McSharry and the Estate. *See, e.g., Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (a plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief); *Heckler v. Mathews*, 465 U.S. 728, 738, 104 S.Ct. 1387, 1394, 79 L.Ed.2d 646 (1984) ("[P]laintiff 'must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' and that the injury 'is likely to be redressed by a favorable decision.' ").

Cates, as an executor of the McSharry Estate, did owe a fiduciary obligation directly to plaintiff and indeed to all of the beneficiaries of the McSharry Estate. *See Lomnitz v. 61 East 86th Street Equities Group*, 129 Misc.2d 157, 163, 492 N.Y.S.2d 915, 920 (Sup.Ct.1985); *In re McDonnell's Will*, 47 Misc.2d 967, 971, 263 N.Y.S.2d 653, 658 (Surr.Ct.1965). Cates, though, has been sued only in his personal capacity as a shareholder, not as an executor of the McSharry Estate. Plaintiff is not, then, pursuing any possible claim she may have that Cates as an executor breached a duty to her as a beneficiary under the will.

**25.** If under all the circumstances, a jury were to conclude that the transaction was unfair, then the redemption of McSharry's shares constituted a *per se* breach of defendants' fiduciary duty to their fellow shareholder. Similarly, proof that defendants purposefully delayed the sale of RMJ to SPC would make out a violation of fiduciary duty. A failure to inform McSharry or the Estate that the value of his shares was grossly in excess of the amount paid would violate defendants' fiduciary duty if McSharry or the Estate lacked that information.

Agreement,[26] and having entered into a separate agreement, prior to the completion of the McSharry buyback, providing for mandatory redemption at death at a price greatly in excess of the price given to McSharry, it stretches credulity that defendants assert they were powerless to deviate from the redemption price set forth in the Agreement.

In fact, plaintiff has a colorable argument that defendants frustrated the intent of the Agreement in their failure to increase the Goodwill factor to reflect the true value of RMJ. According to the express terms of the Agreement, the Goodwill factor was intended to be "flexible," and to reflect the true value of the company. Nevertheless, it was maintained at $100,000 from April 1977 until after McSharry's death in May 1981.[27] Defendants were not, as they contend, barred by McSharry's uninsurability after his diagnosis with cancer, from increasing the Goodwill factor for his benefit. The Agreement, which provided for payouts over time of any amount not covered by insurance, expressly contemplated that a selling shareholder might be paid an amount greatly in excess of the value of his "key-man" life insurance policy.

In this case, the mandatory redemption provision in the Agreement did not extinguish defendants' duty to deal fairly with their fellow shareholder.[28] It is for a jury to determine whether, in light of all the circumstances, including the existence of the Agreement, the course of dealing of the RMJ shareholders and the ongoing negotiations with SPC, the redemption transaction was fair, meeting the fiduciary obligations that the law imposes on the shareholders in a closed corporation. At trial, defendants will have the burden of establishing the fairness of the transaction. *See Helms v. Duckworth,* 249 F.2d 482, 488–89 (D.C.Cir.1957); *Gordon v. Bialystoker Center and Bikur Choklim, Inc., supra,* 45 N.Y.2d at 698, 385 N.E.2d at 288, 412 N.Y.S.2d at 596–97.

Defendants have further testified that they never discussed with McSharry that he would receive only $200,000 in redemption of his RMJ shares, while they would receive millions from the sale of RMJ to SPC. Ryan Dep. at 174–75; Jackson Dep. at 155–57. If a jury were to determine that McSharry lacked this information, it could properly conclude that in suppressing the information, defendants breached their fiduciary duty to McSharry.

Finally, defendants are not entitled to summary judgment against plaintiff on her claim that defendants purposefully delayed the sale of RMJ to SPC until after McSharry's death, or at least until after redemption of his shares. Defendants assured representatives of SPC, prior to McSharry's death, that his holdings would not be a factor in the transaction, since defendant shareholders would repurchase McSharry's shares prior to any purchase of RMJ by SPC. Exhibit D, annexed to Garman Aff.; Deposition of Michael V. Caggiano at 65–67 (taken December 20, 1985) ("Caggiano Dep."). Defendants argue that the delays

---

**26.** The final employment termination agreement between O'Connell and RMJ characterized the entire $350,000 as payment for O'Connell's interest in RMJ. In light of the merger clause in that agreement, and in light of how both RMJ and O'Connell treated the transaction for tax purposes, defendants cannot now characterize the payment as part severance bonus and part payment for stock. Assuming a book value in the neighborhood of $50,000, O'Connell was paid about $300,000 for the goodwill value of his shares.

**27.** The November 1979 draft agreement contained a provision increasing the Goodwill factor to $150,000, but the shareholders never executed the draft. Between November 1979 and McSharry's death in May 1981, the shareholders did not hold a single meeting to discuss increasing the Goodwill factor, in spite of their awareness of RMJ's explosive growth in that period. Defendants have testified that they were aware, prior to McSharry's death, that the company was worth at least $2 million, and as much as $10 million. Jackson Dep. at 135–38, 239–41; Ryan Dep. at 183–89, 232–33. Nevertheless, they failed to increase the Goodwill factor until after McSharry's death, when they increased the figure to $1 million. Jackson Dep. at 175, 215–16; Ryan dep. at 180–81, 289–91; Exhibit N, annexed to Garman Aff.

**28.** Defendant Ryan testified that defendants could have increased the Goodwill factor prior to McSharry's death, but that they failed to do so. Ryan Dep. at 188–89.

were unavoidable, and were simply the result of good faith bargaining. It is for a jury to determine whether defendants' inability to reach a final pricing agreement prior to the time they indeed did agree to sell RMJ to SPC was motivated by a good faith desire to obtain the best price for their company, or rather by a desire to freeze out McSharry and O'Connell from sharing in the profits of the sale. At trial, defendants will have the burden of providing clear proof of the integrity and fairness of the transactions, and of the absence of fraud. *Gordon v. Bialystoker Center and Bikur Choklim, Inc., supra,* 45 N.Y.2d at 698, 385 N.E.2d at 288, 412 N.Y.S.2d at 596–97.

### D. Common–Law Fraud Claims

██ Plaintiff has alleged that in failing to disclose material facts and in purchasing McSharry's shares at a grossly unfair price, defendants have deceived and defrauded both her and the McSharry Estate. Complaint ¶ 37.

Under New York law, a common law fraud claim has five essential elements. A plaintiff must prove misrepresentation of a material fact, falsity of that representation, scienter, reliance and damages. *E.g., Mallis v. Bankers Trust Co.,* 615 F.2d 68, 80 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981); *Freschi v. Grand Coal Venture,* 551 F.Supp. 1220, 1230 (S.D.N.Y.1982).

Plaintiff alleges that defendants purchased McSharry's shares from the Estate at a grossly unfair price, and that the purchase constituted a common law fraud against the Estate and against plaintiff. The gravamen of this claim is that defendants knowingly withheld from the Estate the information it needed to assess accurately the value of the shares. Defendants have admitted that they knew, prior to McSharry's death, that his shares were

worth substantially more than the redemption price. Jackson Dep. at 135–37, 239–41; Ryan Dep. at 183–89, 232–33.[29] Because of their fiduciary relationship, defendants had a duty to inform the Estate of relevant information, rendering nondisclosure in this case equivalent to misrepresentation. Because a jury could find that Cates, as co-executor of the Estate, was involved in self-dealing, his knowledge may not be attributable to the Estate. Accordingly, if a jury were to determine that McCarthy was unaware of the value of McSharry's shares, plaintiff may be able to prove fraud on the Estate. Reliance on the representations of fiduciaries would certainly be reasonable, and damages in this case are apparent.

Similarly, defendants are not entitled to summary judgment of plaintiff's remaining fraud claims. Plaintiff has alleged and presented sufficient evidence that a reasonable jury could find that defendants intentionally withheld from McSharry's Estate that the value of his holdings was greatly in excess of the amount paid to the Estate, and that the sale of RMJ to SPC was intentionally delayed until after McSharry's death.

Accordingly, defendants' motion for summary judgment on plaintiff's fraud claims is denied.

### 3. The Estate's Motion to be Dropped as a Party Defendant

██ The McSharry Estate has moved, pursuant to Rule 21, Fed.R.Civ.P., to be dropped as a party defendant. The Estate argues that it is not a proper party to this action, but has been misjoined. A misjoinder of parties arises when they fail to satisfy any of the conditions of permissive joinder under Rule 20(a), Fed.R.Civ.P.[30] 7 C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 1683, at 443 (1986); *Intercon Research Ass'n, Ltd. v.*

---

**29.** As discussed *supra,* the jury must make a factual determination whether under all the circumstances the redemption transaction was fair.

**30.** Rule 20(a), Fed.R.Civ.P., provides in part: All persons ... may be joined in one action as defendants if there is asserted against them

jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action.

Rule 20(a), Fed.R.Civ.P.

*Dresser Indus., Inc.*, 696 F.2d 53, 57 (7th Cir.1982); *American Fidelity Fire Ins. Co. v. Construcciones Werl, Inc.*, 407 F.Supp. 164, 190 (D.V.I.1975). Thus, misjoinder has been declared where no relief is demanded from one or more of the parties joined as defendants, 7 C. Wright, A. Miller & M. Kane, *supra*, § 1683, at 443, where a particular defendant lacks authority to provide the requested relief, *Greenhouse v. Greco*, 617 F.2d 408, 413–14 (5th Cir.1980); *Hispanic Coalition on Reapportionment v. Legislative Reapportionment Comm'n*, 536 F.Supp. 578, 584 (E.D.Pa.), *aff'd*, 459 U.S. 801 (1982); *Committee for Public Educ. & Religious Liberty v. Rockefeller*, 322 F.Supp. 678, 686 (S.D.N.Y.1971), where a defendant has no discernible legal obligation to provide the requested relief, *Harris v. Young*, 718 F.2d 620, 622 (4th Cir. 1983), or where a defendant's presence is not necessary to afford all the requested relief. *E.E.O.C. v. Levi Strauss & Co.*, 515 F.Supp. 640, 642 (N.D.Ill.1981); *Committee for Public Educ. & Religious Liberty v. Rockefeller, supra*, 322 F.Supp. at 686.

In the exercise of its wide discretion, 7 C. Wright, A. Miller & M. Kane, *supra*, § 1688, at 471; *Intercon Research Ass'n, Ltd. v. Dresser Indus., Inc., supra*, 696 F.2d at 56, this Court has determined that the Estate should be dropped from this action as a party defendant.[31] Since the shares have already been redeemed, the assets sought are not in the hands of the Estate. Rather, plaintiff seeks to recover from defendants Cates, Wunsch, Ryan, and Jackson, who profited from the redemption of McSharry's shares and the subsequent sale of RMJ to SPC. Cates' dual role as executor of the McSharry Estate and shareholder does not affect the propriety of dismissing the Estate in this action. He is being sued only in his capacity as shareholder. Especially in light of the Court's determination that the Agreement was neither an illegal restraint on alienation nor abandoned by the shareholders, the Estate cannot be faulted for acceding to the shareholders' demand for redemption of McSharry's shares. The questions to be determined at trial are whether Cates, Wunsch, Ryan, and Jackson owed a duty of fairness to McSharry not to enforce the mandatory redemption provisions against his Estate, and whether they fraudulently withheld information from McSharry or his Estate.

In her complaint, plaintiff seeks to recover the entire value of McSharry's RMJ shares redeemed from the Estate. Plaintiff's interest, though, as one of seven residuary beneficiaries under McSharry's will, is limited to only a portion of the value of the shares. If this action were to establish rights to the entire value of the shares, then the interests of all the remaining residuary beneficiaries of the McSharry Estate would be affected, which would seem to make all the residuary beneficiaries, or at least the Estate or its executors, necessary parties to this action under Rule 19, Fed.R.Civ.P.[32] If they were joined as parties to this action, the remaining benefi-

---

31. Dismissal of the Estate as a party defendant is particularly appropriate where, as here, no opposition has been lodged against the motion. *See Samuel Goldwyn, Inc. v. United Artists Corp.*, 35 F.Supp. 633, 637–38 (S.D.N.Y.1940).

32. Rule 19, Fed.R.Civ.P., provides in part:
 Rule 19. Joinder of Persons Needed for Just Adjudication
 (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.
 (b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should

ciaries and the Estate would properly be aligned as plaintiffs. Joinder of these parties as plaintiffs would threaten the subject matter jurisdiction of this Court over plaintiff's remaining claims in this action.[33] Drawing upon its equitable power under Rule 19(b), Fed.R.Civ.P.,[34] the Court limits the relief available to plaintiff in this action to the fair value of that portion of McSharry's shares that would fall to her as a residuary beneficiary under McSharry's will. By thus limiting the relief available to plaintiff, the Court protects the interests of the absent beneficiaries, while preserving its power to make plaintiff whole against defendants' alleged unfair and fraudulent activities.

Accordingly, the Estate's motion to be dropped as a party defendant is granted, and the relief available to plaintiff in this action is limited as described above.

## CONCLUSION

Defendants' motion for summary judgment is granted as to counts 1, 2 and 3 of plaintiff's complaint, and denied as to counts 4 and 5. Plaintiff's motion for summary judgment is denied in its entirety. The Estate's motion to be dropped as a party defendant is granted. The parties are directed to file a joint pre-trial order by June 3, 1988.

It is so ordered.

---

proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

....

Rule 19, Fed.R.Civ.P.

33. With the dismissal of plaintiff's federal securities claim, this Court's subject matter jurisdiction rests solely on 28 U.S.C. § 1332, the diversity statute, which requires complete diversity among adverse parties. *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). The record before the Court does not disclose the identity, nor the citizenship, of the remaining residuary beneficiaries of the McSharry Estate. The Estate itself, however, would be considered a citizen of the State of New York for diversity purposes, which would destroy this Court's diversity jurisdiction if it were to be realigned as a party plaintiff.

34. For the text of Rule 19(b), Fed.R.Civ.P., *see* note 32, *supra*.