■ ALLEN P. ROSINY et al., Appellants, v THEODORE N.

SCHMIDT et al., Respondents.—Order, Surrogate's Court, Bronx County (Lee Holzman, S.), entered on or about November 19, 1990, which, after a non-jury trial, *inter alia,* dismissed the complaint and granted the defendants' counterclaim for a declaratory judgment to the extent of declaring that the plaintiffs have no right, pursuant to a shareholders' agreement dated June 30, 1981, to purchase shares held by the defendants' decedents at the time of their deaths and that said shares may pass pursuant to the terms of the decedents' wills, modified, on the law and the facts, the complaint is reinstated and judgment is awarded thereon to the plaintiffs directing specific performance of the 1981 agreement, the defendants' counterclaim for a declaratory judgment is denied, and the order is otherwise affirmed, without costs.

The Surrogate erred in concluding that the post-mortem buyout provision of the 1981 Ched shareholders' agreement was unenforceable.

The record fails to support the defendants' initial contention that the agreement was unconscionable. "A determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made—i.e., 'some showing of an "absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party" *(Williams v Walker-Thomas Furniture Co.,* 350 F2d 445, 449).' *(Matter of State of New York v Avco Fin. Serv.,* [50 NY2d 383,] 389; *see also, Jones v Star Credit Corp.,* 59 Misc 2d 189, 192.)" *(Gillman v Chase Manhattan Bank,* 73 NY2d 1, 10.)

Central to the defendants' claim of unconscionability is the fact that at the time the 1981 agreement was entered into, the plaintiffs were young attorneys and the defendants' decedents, McGuire and Priddy, were elderly and less educated. The record, however, reveals that this was the fourth Ched shareholders' agreement and the only one to which the plaintiffs were signatories. With the exception of one agreement in 1964 which contained a market value-based post-mortem buyout provision, which was later discarded, the others all provided for a book value formula to determine the value of a decedent's shares.

Priddy, a former bookkeeper who was later an office manager, was a signatory to a 1971 agreement wherein the shareholders agreed to return to a book value formula after the 1964 agreement, signed by her husband and containing a fair market value approach, was abandoned. McGuire, who ran a

successful business for many years, executed not only the 1981 agreement but also three others containing book value buyout provisions. He had been a party to the 1964 agreement containing the thereafter rejected market value-based formula and the subsequent 1971 agreement returning to the book value approach. In fact the 1941 shareholders' agreement of C.L. McGuire & Co., Inc., to which McGuire and Priddy's first husband, Theodore Schmidt, were parties, contained such a book value buyout provision. Neither of the plaintiffs, nor either of their parents whose interest in Ched they succeeded, were party to that agreement.

The 1981 agreement is simple and straightforward, and provides that shareholders will not, during their lifetime, "sell, assign, transfer, pledge or hypothecate either all or any part" of their stock unless it is first offered to the other shareholders. The parties agreed that "[t]he price at which said stock shall be offered for sale shall be the book value thereof as of the last day of the month immediately preceding the date of the said offer or $200 per share, whichever amount is greater." With regard to post-mortem transfers, the agreement provided for the surviving shareholders to buy the decedents' shares at the same price applicable to transfers during their lifetime.

Any claim that the Rosinys or the accountant Kwalwasser exerted deceptive or high-pressured tactics to induce the decedents to sign the 1981 agreement is not borne out by the record. Nor were the plaintiffs the draftsmen of the 1981 agreement as the defendants allege. The 1981 agreement contained the identical post-mortem buyout provision as the 1971 agreement, and was only changed to reflect the plaintiffs as the new owners of their mother's shares, a change to which the decedents consented.

Nor does the record support the implication that because of the disparity in age and educational background, the decedents were deceived by the young attorneys. There is nothing to indicate that the decedents were unaware of the provisions of the 1981 agreement they signed, particularly since they executed an agreement with the identical buyout provision ten years earlier, an agreement to which the plaintiffs were not parties. It may not nor should it be presumed that because one is of a certain advanced age that a contract is void or even voidable (see, Ellis v Keeler, 126 App Div 343).

While the $200 per share buyout provision pertains to shares worth considerably more, "the validity of the restriction on transfer does not rest on any abstract notion of

intrinsic fairness of price. To be invalid, more than mere disparity between option price and current value of the stock must be shown. (See, *Palmer* v. *Chamberlin, supra,* 191 F. 2d 532, 541.)" *(Allen v Biltmore Tissue Corp.,* 2 NY2d 534, 543.)

"[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *(W.W.W. Assocs. v Giancontieri,* 77 NY2d 157, 162.)* Moreover, "a mistake, as to the legal effect of an agreement, or as to the legal results of an act, cannot avail to defeat a specific performance" (Pomeroy, Specific Performance of Contracts § 233, at 576 [3d ed 1926]).

Also to be noted is that the 1981 agreement provided for its termination by the sale of the property or by the voluntary or involuntary dissolution of the corporation. Priddy and McGuire owned fifty percent of the shares in Ched and had the option of selling the property or dissolving the corporation. In fact, both options were considered by the decedents. In 1987, a broker had a potential buyer for the property. At a subsequent shareholders' meeting held at McGuire's home, where both McGuire and Priddy's interests were represented by counsel and family members, Priddy's representatives agreed to have an appraisal made of the property before a sale was seriously considered. However, an appraisal was never obtained. Priddy's attorney thereafter wrote to McGuire's attorneys suggesting the dissolution of Ched but the parties never followed through. Despite representation by counsel, neither Priddy nor McGuire opted to sell the property or dissolve the corporation during the seven years following their execution of the 1981 agreement, of which their counsel were aware.

In sum, the record fails to support the absence of meaningful choice on the decedents' part in executing the 1981 agreement. Accordingly, the agreement was not unconscionable *(Gillman v Chase Manhattan Bank, supra).*

Nor is there support in the record for the conclusion that there was no meeting of the minds with respect to the term "book value." The dissent maintains that while the plaintiffs understood the meaning of the term when they signed the 1981 agreement, Priddy and McGuire did not, as demonstrated by "surrounding circumstances." However, these circumstances demonstrate that Priddy and McGuire had signed a 1971 agreement containing the identical buyout provision after rejecting a fair market value approach contained in an earlier agreement. The return to the use of "book value", an unambiguous term *(see, People ex rel. Knickerbocker Fire Ins.*

*Co. v Coleman,* 107 NY 541; *CBM Equip. Corp. v Markwardt,* 77 AD2d 815; *Claire v Wigdor,* 24 AD2d 992, *appeal dismissed* 18 NY2d 687), from fair market value, as well as the use of this term in previous agreements, evinces a meeting of the minds as to this term of the agreement.

The defendants further maintain that the plaintiffs, as attorneys and fellow shareholders in a closely held corporation, owed a fiduciary duty to the decedents and that they breached this duty by failing to discuss the efficacy of the buyout provision with them. As the Surrogate found, the proof supports the plaintiffs' position that they did not act as attorneys for the decedents in any Ched transaction *(see, Stout v Smith,* 98 NY 25; *Colton v Oshrin,* 246 App Div 287).

While it is true that in a close corporation, shareholders must deal in good faith in the conduct of the affairs of the corporation *(Matter of Ronan Paint Corp.,* 98 AD2d 413), we are unaware of any dictate requiring one shareholder to explain a provision of a shareholders' agreement to another, particularly when the latter signed previous agreements containing the identical provision in question and the former did not. As of 1981, there had been virtually no contact between the plaintiffs and McGuire and they had never met Priddy. More importantly, as the Surrogate noted, the corporation did not engage in the type of business where there was a close working relationship among shareholders. No fiduciary duty is created by a shareholders' agreement containing a mandatory buyout provision *(see, Gallagher v Lambert,* 143 AD2d 313, *affd* 74 NY2d 562; *Bevilacque v Ford Motor Co.,* 125 AD2d 516).

The fact that the plaintiffs are attorneys and the decedents were not, does not of itself lead to the conclusion that any advantage was obtained by undue influence *(Stout v Smith, supra).* It is not apparent from the positions they held that the plaintiffs possessed the power to induce the decedents to act against their own interest or that any control was exercised by them *(supra).* Both Priddy and McGuire "were possessed of ordinary intelligence, could read and write, and had an opportunity to examine, or to have examined," the agreement *(supra,* at 31).

Both had been represented by counsel. Those counsel were aware of the 1981 agreement and had reviewed it. Those counsel had actively advised their clients. Those counsel explored the possibility of dissolution proceedings for Ched. Those counsel considered a potential sale of the Ched real estate when a substantial offer was made by a broker repre-

senting a prospective purchaser. Those counsel were aware that Allen Rosiny was about to, and then had put up $40,000 of his own money to secure refinancing of a Ched mortgage which had come due, with no contribution by Priddy or McGuire. In these circumstances, the dissent's observations about fiduciary obligations are simply inapposite.

The dissent further finds that the buyout provision was abrogated by the conduct of the shareholders over the years and cites to the plaintiffs and their mother's succession to their shares without complying with the buyout provision. Contrary to the conclusion reached by the dissent, there was no violation of previous shareholders' agreements when the plaintiffs and their mother before them came into possession of their shares. The shareholders' agreements specifically provided that shareholders could modify the agreements by executing a superseding agreement. Every transfer of Ched stock was effected by formal compliance with the superseding agreement provision of the shareholders' agreements.

To establish abandonment of a contract by conduct, it must be shown that the conduct is mutual, positive, unequivocal, and inconsistent with the intent to be bound (Benson v RMJ Sec. Corp., 683 F Supp 359). The party who asserts abandonment has the burden of establishing it since the termination of a contract is not presumed (supra). The defendants have failed to establish an intent to abandon the buyout provision of the shareholders' agreement.

In conclusion, the post-mortem buyout provision of the 1981 agreement is enforceable and the plaintiffs are entitled to specific performance of its terms.

We have considered the parties' remaining contentions and find them to be without merit. Concur—Sullivan, J. P., Milonas and Rosenberger, JJ.

Carro, J., dissents in a memorandum as follows: In 1941, Charles L. McGuire, Theodore A. Schmidt and Max Levy became shareholders in C.L. McGuire & Co., Inc., pursuant to an agreement apparently drafted by the law firm of Lindenaur and Rosiny. Edward Rosiny, the plaintiffs' father, was a member of that firm. C.L. McGuire & Co. operated an automobile repair business in a building located at 14-16 West End Avenue in Manhattan ("the premises"). In 1957, an opportunity arose to purchase the premises, and Ched Realty was formed for that purpose. The initial shareholders of Ched were Edward Rosiny, who owned 20 shares; and Charles McGuire and Theodore Schmidt, who owned 10 shares apiece. Edward

Rosiny was one of the incorporators, and his law office was listed as the address to be used by the Secretary of State for service of process.

On January 24, 1957, the shareholders entered into an agreement which provided as here pertinent that none of them could sell or transfer their shares without first offering the remaining shareholders the option to purchase at the price of $100 per share or the book value thereof, and in such case the purchasing shareholders would also have to pay back the corporation's loan indebtedness to the retiring shareholder. Upon the death of any shareholder, the representative of his estate was required to offer his shares for sale to the remaining shareholders under the same terms, and the offeree shareholders were obligated to purchase the shares. The automobile repair business continued to operate on the premises until it ceased to do business in 1963.

The original shareholders continued their ownership in Ched until 1964, when plaintiffs' father Edward Rosiny transferred his 20 shares to his wife, Annabelle Rosiny. There is no documentation or testimony to show that there was formal compliance with the provision of the original agreement that the shares had to be offered to the other shareholders before a transfer could be made to a third party. Nevertheless, Charles McGuire and Theodore Schmidt executed a new agreement on October 19, 1964 with Annabelle Rosiny, who signed it as the holder of 20 shares. The 1964 agreement differed from the initial agreement in that the offering price for the sale of shares was modified to provide that "any real property owned by the corporation shall be evaluated at the then fair market value of such real property in place and instead of the value ascribed thereto on the books of the corporation."

The next change in the Ched shareholders arose from the death of Theodore Schmidt. The Surrogate found that while it was "not definitively established" that Edward Rosiny represented Theodore Schmidt's widow Jeannette Priddy (then Schmidt) with regard to her husband's estate or his interest in Ched, four letters on Edward Rosiny's legal stationery dealing with Schmidt's interest in Ched were introduced in evidence. A new shareholders' agreement executed on June 10, 1971 listed Jeannette Schmidt as owner of the shares previously held by her husband. The 1971 agreement differed from the 1964 agreement in that the price at which the shares had to be offered reverted back to the 1957 provision of "book value" which, I note, was not defined in any of the shareholders' agreements, past or future. When Edward Rosiny forwarded

the new agreement to Jeannette Priddy, he wrote: "Also enclosed please find Certificate No. 7 for ten shares of stock of Ched Realty Corp. issued to you. The same is in replacement of the shares of stock of said firm heretofore owned by your late husband, Gus, which you inherited as the sole legatee under his will."

At this point in relating the background to the instant litigation, it is important to identify Jacob Kwalwasser, Ched's accountant. Kwalwasser was a friend of the plaintiffs, Allen and Frank Rosiny, and their parents, Edward and Annabelle Rosiny, since the 1940's, and was a distant relative of the Rosiny family. He performed accounting services for Edward and Annabelle Rosiny, and from the 1970's until his death in 1985, he managed Ched, collecting rents, and paying bills and taxes. He negotiated a lease with Ched's only tenant, and that lease was drafted by Allen Rosiny. Frank Rosiny drafted Kwalwasser's will, and either the plaintiffs' law firm, Rosiny & Rosiny, or Frank Rosiny individually, was the attorney for the executrix of Kwalwasser's estate. The Surrogate concluded that Kwalwasser's "primary allegiance was to plaintiffs' family," rather than to Charles McGuire and Jeannette Priddy.

The heart of this dispute had its genesis in the following events which occurred in 1981. At that time, Allen Rosiny was 36 years old. He had been practicing law for 11 years, after graduating Harvard Law School with honors, and he had been an associate in several prestigious law firms from 1970 to 1979. Frank Rosiny was 41 years old. He had been practicing law for 17 years, after graduating Columbia Law School, and he was formerly a partner at a prestigious law firm. By contrast, Charles McGuire was 80 years old. He had a grade school education, had been retired for 17 years, and had been drinking liquor at the rate of a bottle a day for some years. His mental condition was "not good". Jeannette Priddy was 74 years old. She had a partial high school education, had worked as a waitress, and a bookkeeper, and was preoccupied with the death of her second husband, Harry Priddy, on April 25, 1981.

In the spring of 1981, Kwalwasser telephoned Allen Rosiny and asked if Allen or Frank would be interested in acquiring their mother's shares of Ched stock if the consent of the other shareholders (Priddy and McGuire) could be obtained. Allen testified that Kwalwasser made this suggestion "for income tax reasons, my mother being a very high marginal rate, it would make sense to shift that income [then $2,400 annually] from my mother to my brother and I [sic]." Allen and Frank

Rosiny each paid their mother $10,000 for a one-quarter interest in Ched. Jeannette Priddy and Charles McGuire apparently trusted Kwalwasser and the Rosinys, because without seeking legal advice, they agreed to the stock transfers. At Kwalwasser's request, Allen Rosiny drew up a new agreement whereby he and Frank each became the owner of 10 shares of Ched. The new agreement incorporated the provisions of the 1971 agreement in all essential respects, including the stock transfer provisions.

It does not require a great deal of acumen to understand the significance of what occurred when Jeannette Priddy and Charles McGuire executed the new shareholders' agreement on June 30, 1981. At the time the agreement was signed, Priddy's and McGuire's interests were each worth in excess of $42,000* and gaining in value. But while the shares were gaining in *market* value, their *book* value was decreasing because of declared yearly depreciation of the premises on Ched's books. Thus, when the 1981 agreement was signed, Ched had a negative book value, and each share was redeemable for $200 upon the death of a shareholder. The death-buyout provision might be considered not oppressive with respect to the 1971 shareholders' agreement, even assuming that the parties understood the significance of book value, because the parties were of roughly equal age. But with the replacement of Annabelle Rosiny by her two sons as shareholders, the 1971 agreement underwent a substantial change, and became grossly one-sided, for the Rosinys, approximately 40 years younger, were virtually guaranteed to outlive Priddy and McGuire, and thus enjoy an unconscionable windfall. When the Surrogate asked Allen Rosiny whether he as a lawyer would ever advise a client in the position of McGuire or Priddy to consent to the 1981 agreement, he contended that he did not understand the questions, or evaded their significance, and never responded directly.

Returning to the chronology of events, on September 27, 1986 Mary Jane Lidaka, an attorney for Mrs. Priddy, wrote to Allen Rosiny requiring information regarding the net value and corporate assets and liabilities of Ched. Allen Rosiny forwarded to Ms. Lidaka the U.S. income tax return for the corporation for the year 1985. It appears that Mrs. Priddy had been exploring the possibility of transferring her shares in

---

* The appraised fair market value of the premises owned by Ched was $235,000 as of June 30, 1981, and the mortgage balance was approximately $66,000. Dividing the $169,000 difference by 40, the number of outstanding shares, results in a per share price of $4,225.

Ched to her two sons while retaining the right to receive the income. It further appears that she was advised by Ms. Lidaka that she could not effectuate a transfer without first offering the shares to the other shareholders.

In January, 1987, Cushman & Wakefield indicated that it had a buyer who was willing to purchase the premises that Ched owned for $1,250,000. As a result of this offer, a share-holders' meeting was held at Charles McGuire's home in the Bronx on January 31, 1987. Mrs. Priddy did not attend the meeting, but her son Ted, her son-in-law Bob Robinson (who was a real estate broker) and her attorney attended the meeting on her behalf. Both of the plaintiffs were present, as well as Mr. McGuire, his daughter, and his attorney. A letter dated February 4, 1987 from Mrs. Priddy's attorney to Mr. Robinson contains the opinion that "Frank was particularly abrupt and argumentative" and "Allen was equally evasive, but more pleasant." Plaintiffs testified that they did not express an opinion relative to the Cushman & Wakefield offer, and this is consistent with the statement in the February 4, 1987 letter of Mrs. Priddy's attorney that he did not know their position on the offer. The witnesses who testified about the events at this meeting confirmed that Mr. Robinson sug-gested that an appraisal be obtained for the property, and when the Rosinys refused to contribute toward the cost of an appraisal, it was agreed that he would either obtain it at no cost to the corporation, or any cost would be shared by Mrs. Priddy and Mr. McGuire. The outcome of the meeting was a general agreement that if Cushman & Wakefield made any further inquiries of Allen Rosiny, he would refer them to the attorney for Mr. McGuire, and the parties would await the appraisal before taking any further action. The appraisal was never obtained, and Cushman & Wakefield did not take any additional action toward effecting a sale of the premises. The attorney for Mrs. Priddy apparently believed that the plain-tiffs had some hidden agenda, and in a February 5, 1987 letter to the attorney for Mr. McGuire stated that he was "exploring the possibility of a judicial dissolution of the corporation if the stockholders cannot agree to sell the property at a reasonable price."

The last communication between the plaintiffs and the other shareholders prior to their respective deaths related to satisfying an obligation of approximately $38,000 owed to Goldome Bank which was secured by a mortgage on Ched's real property. In December, 1987, Allen Rosiny was able to obtain a commercial loan from Banco Central to pay the

Goldome obligation by promising to use the bank for Ched's accounts and by opening an account in the sum of $40,000 in his own name in that bank, and then assigning the account as security for the loan. Allen Rosiny testified that the other shareholders signed the necessary documents in connection with the loan only after their attorneys were assured that they would not be personally liable for the loan, and that he would not have used his own funds as security for the loan if he had known that the other shareholders did not intend to honor the provisions of the 1981 agreement.

Charles McGuire died on June 19, 1988, and Jeannette Priddy died on July 25, 1988. Allen Rosiny advised their estate representatives that Ched had a negative book value and referred them to the 1981 agreement for the purchase price, which was specified in the agreement as "the book value thereof * * * or $200.00 per share, whichever amount is greater." When the estate representatives protested that the agreement was unconscionable (the fair market value was then $41,500 per share), the plaintiffs commenced the instant litigation to compel the estates to transfer the shares for $200 apiece. By December 1989, the premises had increased in value to $2,500,000, and each share was worth over $60,000.

It may be noted, since this is an action in equity, that aside from the Ched stock, the defendant estates are meager; neither deceased shareholder had any other stock, bonds or real estate, except for the residences in which they respectively lived. It bears repeating that the plaintiffs' mother, Annabelle Rosiny, was permitted by the deceased shareholders to obtain ownership of 20 shares, without reference to the buyout provisions of the agreement then in force. Likewise, in 1981 the plaintiffs obtained ownership of their 10 share interests without a word of protest from the deceased shareholders, or any reference to the buyout provisions of the agreement then in force. Nevertheless, the plaintiffs find nothing unconscionable in their obtaining nearly the entire corpus of the decedents' estates, worth over $800,000 at the time of their deaths, for $4,000. The Surrogate disagreed, and so do I.

At trial, Jeannette Priddy's son and Charles McGuire's daughter testified in support of their respective positions that their parents were unsophisticated, that they had trusted the Rosinys, and that they had not understood that they could not freely leave their interests in Ched to their children upon their deaths. Jeannette Priddy's son testified that his mother had worked as a waitress, that his father had worked as an automobile mechanic until he retired in the early 1960's, that

his parents had moved 80 miles away from New York in 1964, that his mother continued to reside in this residence until her death and that she became a widow for the second time in 1981. He conceded that his mother had also worked as a bookkeeper prior to her marriage in 1925, and had corresponded with at least two attorneys about her interest in Ched. He nevertheless maintained that his mother had only met in person with an attorney on one occasion, and that she believed that only a lifetime transfer of her interest in Ched was restricted. His mother had indicated on more than one occasion that she intended to leave her interest in Ched to her two sons. A letter from his mother to her other son is consistent with this contention.

Charles McGuire's daughter had lived with him in his house in the Bronx for over 40 years. She testified that after his wife had died, and during the 1970's until the early 1980's, he often drank a bottle of alcohol a day, and was frequently drunk. On one occasion he told her that he would sign anything that the Rosinys sent. She recalled that Frank Rosiny had assured her father that everything would be okay when her father appeared concerned at the shareholders' meeting that was held in his home in January, 1987.

Two of the central issues presented in this case concern the doctrine of unconscionability, and whether there was a breach of a fiduciary relationship which existed among the parties. The Surrogate stated the plaintiffs' position on these issues as follows: "Plaintiffs' interpretation of the proof is that their lack of involvement with the other shareholders precludes applying any principle of law based upon an attorney/client relationship. Turning around the admonition that the sins of the fathers may be visited upon their sons, they assert that even if their father had at one time or another acted as the attorney for the other shareholders, which they are not willing to concede, this has no bearing on their obligation to the other shareholders. The plaintiffs contend that the doctrine of unconscionability is inapplicable because their lack of involvement in the events leading up to the signing of the 1981 agreement precludes finding the existence of high pressure tactics and that without such a finding there was no procedural unfairness which must be established together with substantive unfairness before an agreement can be held to be unconscionable (*Sablosky v. Gordon Co.*, 73 NY2d 133). Their final argument is that the other shareholders, at least by 1986 or 1987 when they obtained independent counsel relative to the affairs of the corporations, eventually had to have been

apprised as to the meaning of the option provisions and that their estates should be estopped from not honoring these provisions when they had remained mute during their lifetimes and permitted Allen Rosiny, in reliance upon the provisions of the agreement, to use his own funds as security for a corporate obligation."

In analyzing the various actions and shifting relations among the parties past and present, it is apparent that insofar as their interests were adverse, the Rosiny family and their friend and accountant Jacob Kwalwasser were aligned on one side, while Theodore A. Schmidt, Jeannette Priddy and Charles McGuire stood on the other. The plaintiffs' attempt to distance themselves from the consequences of any actions of Kwalwasser and their predecessors in interest prior to 1981 simply does not withstand analysis in the circumstances presented herein.

It is well established in New York that fellow shareholders in a closely held corporation owe each other, and where applicable their estates, those duties and responsibilities found in fiduciary relationships, which include "a duty to deal fairly, in good faith, and with loyalty." *(Benson v RMJ Sec. Corp.,* 683 F Supp 359, 375 [SD NY 1988]; *see also, Matter of Public Relations Aids,* 109 AD2d 502, 511.) "[I]n a close corporation, the relationship between the shareholders vis-à-vis each other is akin to that between partners [citations omitted]. The law exacts a high degree of fidelity and good faith in dealings between partners in the conduct of the affairs of the partnership. The same obligations are likewise applicable to shareholders in a close corporation." *(Matter of Ronan Paint Corp.,* 98 AD2d 413, 421; *see also,* 2 O'Neal & Thompson, O'Neal's Close Corporations § 8.12 [3d ed].)

In *Matter of Gordon v Bialystoker Ctr.* (45 NY2d 692, 698), the Court of Appeals reiterated the longstanding principle that "where a fiduciary relationship exists between parties, 'transactions between them are scrutinized with extreme vigilance, and clear evidence is required that the transaction was understood, and that there was no fraud, mistake or undue influence. Where those relations exist there must be clear proof of the integrity and fairness of the transaction, or any instrument thus obtained will be set aside or held as invalid between the parties' *(Ten Eyck v Whitbeck,* 156 NY 341, 353)." Even in the absence of a fiduciary relationship, where one party to a transaction deals from a position of " 'weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted,

the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood. This doctrine is well settled' " *(Gordon v Bialystoker Ctr.,* 45 NY2d, *supra,* at 699, quoting *Cowee v Cornell,* 75 NY 91, 99-100; *see also,* 3 Pomeroy, Equity Jurisprudence § 956 [5th ed 1942]).

These rules are closely related to the salutary and far-reaching principle that he who seeks equity must do equity. With regard to that principle as it affects a party's right to specific performance of a contract, which is an equitable remedy, Pomeroy states: "The great and most beneficial principle, to which I have referred, extends far beyond these features which affect the validity and very existence of agreements; it applies to contracts which are valid, and which confessedly create legal obligations; it is developed in its practical operation, so as to resist and counteract every possible circumstance and incident of unfairness, inequality, and inequity. The doctrine that he who comes into the court seeking equity—that is, seeking to obtain an equitable remedy —must himself do equity, means not only that the complaining party must stand in conscientious relations towards his adversary, and that the transaction—be it a contract or not— from which his claim arises, must be fair and just in its terms, but also that the relief itself must not be oppressive or hard upon the defendant, and must be so modified and shaped as to recognize, protect, and enforce the latter's rights arising from the same subject-matter, as well as those inhering in the plaintiff. It is by virtue of this principle that the specific performance of a contract will be refused when the plaintiff has obtained the agreement by sharp and unscrupulous practices, by overreaching, by concealment of important facts, by trickery, by taking undue advantage of his position, or by any other means which are unconscientious; and when the contract itself is unfair, one-sided, unconscionable, or affected by any other such inequitable feature, and where the specific enforcement would be oppressive or harsh upon the defendant, or would prevent the enjoyment of his own rights, or would in any other manner work injustice." (Pomeroy, Specific Performance of Contracts § 40, at 120-121 [3d ed 1926].)

Pomeroy further observes that in certain circumstances, which are presented in this case, the defendant need not demonstrate that the plaintiff was guilty of *intentional* dishonesty or unfairness: "Although the very terms of an agreement, taken by themselves, may be unobjectionable, the circum-

stances immediately preceding or accompanying, or succeeding its conclusion, the relations of the parties, the acts or omissions of the plaintiff during the negotiation, or even after the time of its being entered into, may be such as to stamp a character of inequity upon the agreement and to furnish an ample reason for withholding the equitable remedy. It may be laid down as a general proposition, that if there is any circumstance or fact connected with the preliminary negotiation or subsequent operation, with the *relations of the parties, or conduct of the plaintiff,* which renders its enforcement unfair, harsh, or inequitable upon the defendant, such specific performance will be refused; and to produce such a result, there need have been no intentional dishonesty or unfairness, although, in the great majority of instances, the design to overreach or obtain an undue advantage will of course be present." *(Id.,* § 183, at 469 [emphasis in original].)

"Whenever the defendant, against whom a specific performance is asked, has fallen into a mistake, which the plaintiff, by his acts or omissions, either intentionally or unintentionally, induced or made probable or even possible, or to which the plaintiff contributed, such error, by the plainest principles of equity, prevents an enforcement of the agreement." *(Id.,* § 244, at 589.)

In judging the nature and effect of an agreement, the court may be incidentally aided by knowledge of the circumstances attending its inception, which "even though wholly free from wrong or blame, may furnish a clue for the right understanding of the agreement, a light in which its provisions must be read. Among these attending facts, which ordinarily aid the court in testing the fairness of the contract, and which may, therefore, be shown by extrinsic evidence, are the *mental feebleness* of a party, although not amounting to a legal incapacity; the age, poverty or ignorance of the parties; the manner of entering into the contract; the want of advice; the inadequacy of the price, and many other analogous circumstances." *(Id.,* § 179, at 459-460.)

Evaluation of the underlying facts in this case in the light of the aforesaid principles confirms the correctness of the Surrogate's conclusion that ordering specific performance of the 1981 agreement according to its literal terms would be inequitable, unduly harsh and oppressive upon the defendants, and unjust. Neither of the elderly lay shareholders was represented by counsel at the time the agreement was entered into, presumably because they trusted Kwalwasser, and the plaintiffs, whose father had served them as a counselor and advisor

for more than 30 years. During the period from 1957 to 1988 none of the parties had adhered to the buyout provisions of the several shareholders' agreements in Ched. The practice prior to 1988 was that of permitting transfers within one's family without involving the right of first refusal that the other shareholders had. When Jeannette Priddy's first husband, Theodore Schmidt, died, Edward Rosiny wrote to her that the decision whether she should retain the Ched stock held by her husband was hers to make, and he later sent her a stock certificate "in replacement of the ten shares of stock of said firm heretofore owned by your late husband, Gus, which you inherited as the sole legatee under his will." These communications were sent on Edward Rosiny's legal stationery, and I note that plaintiff Frank Rosiny was listed thereon as a member of the firm. Thus it was the Rosinys who led Mrs. Priddy to conclude, as she expressed in a letter dated November 14, 1986, in which she discussed the inadequacy of the offering price on the Ched property, that when she died her sons would inherit her interest in Ched. The Rosinys should thereby be estopped from enforcing the death buyout provision of the 1981 agreement.

A closely related issue is whether the buyout provisions carried forward in the several agreements were effectively abrogated by the conduct of the parties during the 30 years of Ched's existence. "The rule is recognized that stockholders may by consent or by acts and conduct repeal or accomplish the modification or abrogation of a by-law, as fully and effectively as if done by them by formal action, and the by-law is deemed to have been repealed or modified, as the case may be; likewise, non-usage of a by-law, continuing for a considerable length of time, and acquiesced therein, will work its abrogation *(Evans* v. *Southern Tier Masonic Relief Assn.,* 76 App. Div. 151; *Bowler* v. *American Box Strap Co.,* 22 Misc. 335; *Bay City Lumber Co.* v. *Anderson,* 8 Wn. [2d] 191; *Elliott* v. *Lindquist,* 94 Pitts. L.J. 295; 14 C.J., Corporations, § 456, p. 359; 1 Cook on Corporations [8th ed.], § 4a, p. 37; 8 Fletchers's Cyclopedia Corporations, § 4183; 1 Morawetz on Private Corporations [2d ed.], § 499; 2 Thompson on Corporations [3d ed.], §§ 1158, 1159; 1 White on New York Corporations [1929 ed.], p. 175)." *(Pomeroy v Westaway,* 189 Misc 307, 310, *affd* 273 App Div 760; *see generally,* Annotation: *What Constitutes Waiver of Stockholder's or Corporation's Right to Enforce First-Option Stock Purchase Agreement,* 55 ALR3d 723, § 3 [a].) Application of this principle is particularly appropriate in this case because it would be inequitable to allow the Rosinys to

enforce the buyout provisions when they, and their mother before them, succeeded to ownership of their Ched shares without adherence to those provisions.

Alternatively, even if we were to assume the continued viability of the buyout provisions despite the long history of their having been ignored, I would agree with the Surrogate's conclusion that there was no meeting of the minds as to the meaning of "book value," which as previously noted, was never defined in any of the agreements. Allen Rosiny conceded that he knew what book value meant when he signed the 1981 agreement, and it is clear from the surrounding circumstances that the now deceased shareholders did not know the meaning of book value when they signed the 1981 agreement. There was simply no imaginable reason for Priddy and McGuire to have considered plaintiffs as natural objects of their bounty, and both had expressed a desire that their Ched shares be inherited by their respective children. As articulated by the Surrogate: "It defies common sense that the elderly decedents knowingly and reasonably entered into an agreement which would require their estates to sell for $2,000 their respective interests in the corporation which were worth in the neighborhood of $40,000 at the time the agreement was signed. Under all of the circumstances of this case, the court finds that the plaintiffs reasonably believed that book value meant one thing while the decedents reasonably believed it meant another thing and, consequently, the lack of agreement as to this essential term results in a determination that no contract was ever created relative to the sale of shares upon the death of a shareholder."

The Surrogate's analysis is consistent with contract principles governing the legal consequences of mistakes as to the meaning given to words and expressions. As stated in Corbin on Contracts (§ 104 [1950]):

"A much more common form of mistake is as to the meaning of words and expressions. Both parties know with accuracy the words used but understand them differently. Either party may inadvertently or ignorantly use words that by common usage do not express his meaning and intention. Either party may inadvertently or ignorantly give to another's words a meaning that the other did not intend or that may not accord with common usage. In such a case there is a misunderstanding of the terms used in making a contract, a misunderstanding that prevents a 'meeting of the minds', that is, prevents a true agreement. Nevertheless, there may be a valid contract in spite of such a lack of true agreement * * *

"If one of the parties gave a meaning to the language that is not the only reasonable one under the circumstances, and the other expressed his assent knowing that the first party was giving it this meaning, that is the meaning that the court should adopt, and there is a contract accordingly. But if the parties had materially different meanings, and neither one knew or had reason to know the meaning of the other, there is no contract."

Either evaluation of the understanding of the parties should result in a determination in the defendants' favor. The only reasonable interpretation of "book value" from McGuire and Priddy's standpoint was that book value was equivalent to market value, and the Rosinys, both experienced attorneys, had every reason to know or at least suspect that such was the decedents' understanding. Thus, if there was a contractual agreement as to the meaning of book value, that meaning should be deemed equivalent to market value. On the other hand, if the Rosinys did not know or have reason to know that Priddy and McGuire understood book value as equivalent to market value, there was no meeting of the minds, and no contract with respect to the provisions here at issue. There is simply no basis for our disturbing the conclusions of the fact-finding court in this regard, because before doing so it should appear "obvious that the court's conclusions could not be reached under any fair interpretation of the evidence" *(Claridge Gardens v Menotti,* 160 AD2d 544, 545). That cannot be said in this case.

Plaintiffs contend that buyout clauses like the one here in issue are enforceable despite blatant unfairness of the option price, citing *Allen v Biltmore Tissue Corp.* (2 NY2d 534), a case involving not a shareholders' agreement, but the bylaws of a corporation giving it an option to purchase a shareholder's stock upon his death at the price originally paid. The Court of Appeals, while holding that the validity of the restriction did not "rest on any abstract notion of intrinsic fairness of price" *(supra,* at 543), was addressing itself to restrictions that are clearly set forth in the bylaws, noted on the face of the shares, and could serve as a "veto" of new members in a close corporation. The Court was *not* concerned with a case of gross disparity in price as indicative of over-reaching, unconscionability, or an absence of mutual understanding regarding the terms of an agreement. The Court in *Allen* said that "[t]o be invalid, more than mere disparity between option price and current value of the stock must be shown" *(supra,* at 543). Surely, considerably more than mere

disparity between option price and current value of the stock has been demonstrated by the defendants herein. Moreover, in the circumstances of this case, it was the plaintiffs who were required to " 'show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood' " *(Gordon v Bialystoker Ctr.,* 45 NY2d, *supra,* at 699). The plaintiffs clearly failed to meet their burden of proof on this issue.

*Gallagher v Lambert* (74 NY2d 562), relied upon by the plaintiffs, is also distinguishable. There, a corporate employee, who was also a minority shareholder, was required to submit his shares to repurchase by the corporation at book value if he was terminated by a certain date. Plaintiff alleged that his employment was terminated for the sole purpose of allowing the corporation to buy back its shares at a reduced price. In holding that there was no breach of fiduciary duty in firing plaintiff under those circumstances, there was no suggestion that plaintiff was not fully aware of the significance and operation of the agreement into which he had entered. In fact, the Court in *Gallagher* specifically noted that "[p]laintiff not only agreed to the particular buy-back formula, he helped write it and he reviewed it with his attorney during the negotiation process, before signing the agreement and purchasing the minority interest." (74 NY2d, *supra,* at 567.)

Finally, the plaintiffs argue that at least in 1986 or 1987, the decedents could have dissolved the corporation, and that as a consequence of their not having done so, their estates should be estopped from claiming that the death buyout provision is unenforceable. This contention ignores the unique procedural history and fiduciary relationships developed over the years, the various equitable principles set forth at length earlier in this opinion, which clearly favor the defendants, and unjustifiably presumes that the aged and unsophisticated decedents had reason to believe that the plaintiffs would seek to strictly enforce against their estates a buyout provision that had been consistently ignored by all the shareholders over a period of 30 years.

The majority has reversed virtually every factual finding and legal conclusion reached by the Surrogate in his extensive and thoughtful opinion (NYLJ, Oct. 2, 1990, at 23, col 4), and in its place has constructed a scenario which is at odds with the evidence, and contrary to experience and common sense. The majority minimizes Priddy's and McGuire's lack of financial sophistication by pointing out that Priddy was once a bookkeeper (sometime before 1925), and an officer manager

sometime thereafter, and McGuire ran a successful business for many years (he was an automobile mechanic and his business was repairing automobiles). That McGuire was afflicted with alcoholism, consuming a bottle of liquor daily when he signed the 1981 agreement, is ignored, implying that this circumstance also is of little significance.

The majority imputes to the decedents open-eyed knowledge of the legal significance of the 1981 agreement because "book value" is an unambiguous term. Interestingly, the first case cited by the majority in support of this proposition *(People ex rel. Knickerbocker Fire Ins. Co. v Coleman,* 107 NY 541) generally equates "book value" with "actual value", that is, the value of assets less liabilities in connection therewith. Significantly, Frank Rosiny testified that he did not know Ched's book value in 1981, and Allen Rosiny testified with regard to his knowledge of Ched's book value, that "it was not knowledge that I had in '81 *or indeed could have had prior to Mr. Kwalwasser's death* [in 1985]." (Emphasis added.) Are decedents to be faulted then for believing in 1981 that the book value of Ched's property bore at least a reasonable relationship to its actual value?

To be sure, "book value" has a literal definition as "the value of something as shown by the books of account of the business owning it" (Webster's New Collegiate Dictionary 127 [1973 ed]). But the central aspect of "book value" as pertinent to this case is its ordinary relationship to actual or market value, and whether there is anything in the record that would have led the decedents to suspect the extraordinary circumstance that Ched had a negative book value while its only asset had a substantial and increasing market value. The changes in past agreements from book value to fair market value and back to book value, far from demonstrating Priddy's and McGuire's understanding of the financial significance of those terms, rather suggest their understanding that the terms were almost interchangeable, and more procedural than substantive. I note that a recent New York Times article (May 9, 1992, section 1, at 50, col 1), reporting on the deficit of the Mutual Benefit Life Insurance Company, stated that "[t]he deficit is blamed on heavy investment in real estate, which is currently valued at about 20 percent less than book value." On the west coast, the Los Angeles Times (Apr. 28, 1992, part D2, at 23) reported the book value to market value ratio of "the best performing companies in California". Of the 25 companies listed in the article, only *one* had a book value more than 4% lower than its market value.

The majority finds that the record does not demonstrate that high pressure tactics were used to induce the decedents to sign the 1981 agreement, but that claim was not advanced by the defendants. The majority also finds no evidence of deception by the accountant Kwalwasser, but his deception and breach of trust are patent. As Ched's manager and accountant from the 1970's until 1985, Kwalwasser surely was in a fiduciary relationship with Priddy and McGuire; yet it was he who suggested to Priddy and McGuire that they permit the younger Rosinys to acquire their mother's shares, thus practically guaranteeing that the Rosinys would eventually enjoy an unconscionable windfall at the expense of Priddy's and McGuire's heirs. Kwalwasser, of all people, surely was aware that Ched had a negative book value in 1981, and it is a virtual certainty that he neither advised the decedents of this circumstance, nor of its significance.

In *Meinhard v Salmon* (249 NY 458, 464), then Chief Judge Cardozo enunciated these ringing phrases that reverberate in our equity jurisprudence to this day: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions *(Wendt v. Fischer,* 243 N. Y. 439, 444). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

The determination rendered by this Court today is not, in my view, faithful to these precepts. To the contrary, these precepts, and those stated by Pomeroy as quoted earlier in this opinion, point ineluctably toward an affirmance in this case, thus giving the Priddy and McGuire heirs that which any fair-minded person must conclude is rightfully theirs.

It is hornbook law that "[i]n the general juristic sense, equity means the power to meet the moral standards of justice in a particular case by a tribunal having discretion to mitigate the rigidity of the application of strict rules of law so as to adapt the relief to the circumstances of the particular case." (McClintock, Equity, at 1 [1936].) Can it truly be said that this Court has vindicated the moral standards of justice by giving

due recognition to the Surrogate's equity power in this case? I think not. One of our great contemporary teachers of jurisprudence posited that justice could best be defined by reflecting on what actions so violated principles of fairness, equity and morality that they provoked a "sense of injustice" (Cahn, The Sense of Injustice [1949]). It seems to me fitting to borrow Justice Stewart's famous test for obscenity—"I know it when I see it"—set forth in his concurrence in *Jacobellis v Ohio* (378 US 184, 197), in expressing the sense of injustice that I not only see in the result reached herein, but feel deep within.

I would accordingly affirm the Surrogate's order entered November 19, 1990, which declared that plaintiffs have no right under the 1981 agreement to purchase the shares at issue for a total sum of $4,000, and that those shares should instead pass pursuant to the terms of the wills of the decedents.